Opinion
CANTIL-SAKAUYE, C. J.
Bristol-Myers Squibb Company (BMS), a pharmaceutical manufacturer, conducts significant business and research activities in California but is neither incorporated nor headquartered here. In March 2012, eight separate amended complaints were filed in San Francisco Superior Court by or on behalf of 678 individuals, consisting of 86 California residents and 592 nonresidents, all of whom allegedly were prescribed and ingested Plavix, a drug created and marketed by BMS, and as a result suffered adverse consequences. BMS contests the propriety of a California court’s exercising personal jurisdiction over it for purposes of adjudicating the nonresident plaintiffs’ claims.
Under the particular circumstances present here, we conclude personal jurisdiction is authorized by Code of Civil Procedure section 410.10, which extends jurisdiction to the maximum extent permissible under the United States Constitution. Although BMS’s business contacts in California are insufficient to invoke general jurisdiction, which permits the exercise of jurisdiction over a defendant regardless of the subject of the litigation, we conclude the company’s California activities are sufficiently related to the nonresident plaintiffs’ suits to support the invocation of specific jurisdiction, under which personal jurisdiction is limited to specific litigation related to the *789 defendant’s state contacts. (See Vons Companies, Inc. v. Seabest Foods, Inc. (1996) 14 Cal.4th 434, 446 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (Vons).)
Accordingly, we affirm the judgment of the Court of Appeal, which held that BMS was subject to the personal jurisdiction of the California courts on the basis of specific jurisdiction.
I. Factual and Procedural Background
BMS manufactures Plavix, a prescription drug used to inhibit blood clotting. In the eight amended complaints filed in the superior court, 86 California residents and 592 residents of 33 other states sued BMS and McKesson Corporation, a pharmaceutical distributor headquartered in California, for injuries allegedly arising out of their use of Plavix.[1] The state in which the largest number of plaintiffs reside is Texas, with 92 plaintiffs, followed by the 86 California plaintiffs, followed by Ohio, with 71 plaintiffs.
Each amended complaint contains the same 13 causes of action: strict products liability (based on both design defect and manufacturing defect); negligence; breach of implied warranty; breach of express warranty; deceit by concealment (Civ. Code, §§ 1709, 1710); negligent misrepresentation; fraud by concealment; unfair competition (Bus. & Prof. Code, § 17200); false or misleading advertising (Bus. & Prof. Code, § 17500); injunctive relief for false or misleading advertising (Civ. Code, § 1750 et seq.); wrongful death; and loss of consortium.
The plaintiffs allege that defendants engaged in “negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of Plavix.” According to the complaints, defendants allegedly promoted the drug to consumers and physicians by falsely representing it “as providing greater cardiovascular benefits, while being safer and easier on a person’s stomach than aspirin,” but defendants knew those claims were untrue because ingesting Plavix allegedly involves “the risk of suffering a heart attack, stroke, internal bleeding, blood disorder or death [which] far outweighs any potential benefit.”
Plaintiffs allege different injuries, and sometimes combinations of injuries, which they claim were caused from the ingestion of Plavix. These injuries include bleeding, bleeding ulcers, gastrointestinal bleeding, cerebral bleeding, *790 rectal bleeding, heart attack, stroke, hemorrhagic stroke, subdural hematoma, thrombotic thrombocytopenic purpura, and death. The complaints allege that 18 of the 678 individuals whose injuries underlay these actions died as the result of ingesting Plavix.
The actions were assigned as a coordinated matter to a judge of the San Francisco Superior Court.
BMS moved to quash service of summons on the ground that the court lacked personal jurisdiction over it to adjudicate the claims of the 592 nonresident plaintiffs, who are real parties in interest in this proceeding (hereafter referred to as “the nonresident plaintiffs”)- BMS noted that the complaints’ allegations do not include any factual claims that the nonresident plaintiffs’ injuries occurred in California or that they had been treated for their injuries in California.
In declarations supporting the motion, BMS officers stated that the company is incorporated in Delaware, is headquartered in New York City, and maintains substantial operations in New Jersey, including major research and development campuses. BMS has approximately 6,475 employees in the New York and New Jersey area, comprising 51 percent of its United States workforce.
BMS further asserted that its research and development of Plavix did not take place in California, nor was any work related to its labeling, packaging, regulatory approval, or its advertising or marketing strategy performed by any of its employees in this state. BMS has never manufactured Plavix in California. These activities were instead performed or directed from the company’s New York headquarters and New Jersey operating facilities. According to data provided by the company, in a 12-month period ending in July 2012, BMS’s sales revenue from Plavix sales in California constituted 1.1 percent of the company’s total nationwide sales revenue of all of its products.
But the declarations submitted by BMS also disclosed that the company maintains substantial operations in California, including five offices that are primarily research and laboratory facilities employing approximately 164 people. BMS additionally employs approximately 250 sales representatives in the state. BMS also has a small office in Sacramento to represent and advocate for the company in state government affairs.
In opposition to the motion to quash, plaintiffs submitted materials showing that BMS sold almost 187 million Plavix pills to distributors and wholesalers in California from 2006 to 2012, with sales revenue of almost *791 $918 million. Furthermore, plaintiffs noted that BMS maintains a registered agent for service of process in California.
The superior court denied BMS’s motion to quash service of summons, concluding the company’s sales and other activities in California were sufficiently extensive to subject it to the general jurisdiction of the state courts.
BMS petitioned the Court of Appeal for a writ of mandate, naming the nonresident plaintiffs as real parties in interest. The Court of Appeal first summarily denied the petition on the same day as the United States Supreme Court announced its decision in Daimler AG v. Bauman (2014) 571 U.S. 117 [187 L.Ed.2d 624, 134 S.Ct. 746] (Daimler), which clarified limits on general jurisdiction. We granted review and transferred the matter back to the Court of Appeal for issuance of an order to show cause in light of Daimler. After briefing and oral argument, the Court of Appeal again denied the writ, this time by an opinion holding that BMS’s activities in California were insufficient to subject it to general jurisdiction in the state, but that, given the nature of the action and BMS’s activities in California, our courts may properly exercise specific jurisdiction over BMS in this matter.
We granted BMS’s petition for review, requesting briefing on both types of personal jurisdiction, general and specific.
II. Discussion
Under Code of Civil Procedure section 410.10, California courts “may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.” “The Due Process Clause of the Fourteenth Amendment constrains a State’s authority to bind a nonresident defendant to a judgment of its courts.” (Walden v. Fiore (2014) 571 U.S._, _ [188 L.Ed.2d 12, 134 S.Ct. 1115, 1121].) “Due process limits on the State’s adjudicative authority principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties.” (Id. at p._ [134 S.Ct. at p. 1122].)
Under the federal Constitution, a court exercising jurisdiction over a nonresident defendant comports with due process as long as the defendant “has such minimum contacts with the state that the assertion of jurisdiction does not violate ‘ “traditional notions of fair play and substantial justice.” ’ ” (Vons, supra, 14 Cal.4th at p. 444, quoting Internat. Shoe Co. v. Washington (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 66 S.Ct. 154] (International Shoe).) Plaintiffs bear the initial burden of proving state contacts sufficient to justify the exercise of jurisdiction. (Vons, supra, 14 Cal.4th at p. 449.) The jurisdiction of courts to render judgment against a person is historically grounded in *792 the courts’ power over the person, originally premised on a person’s presence within the territorial jurisdiction of the court. (International Shoe, supra, 326 U.S. at p. 316.) Because “the corporate personality is a fiction,” however, a corporation’s “ ‘presence’ ” in a state must be determined by the activities of its agents (ibid.), and the demands of due process in this context “may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there.” (Id. at p. 317.)
In some cases, the corporation’s continuous activities within the state have been found “so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.” (International Shoe, supra, 326 U.S. at p. 318.) This has become known as “general,” or “all-purpose,” jurisdiction. (Daimler, supra, 571 U.S. 117 [134 S.Ct. 746, 751, 754].)
In other circumstances, where the company’s activities in the forum state are more limited, general jurisdiction may be lacking but jurisdiction may nonetheless be proper because the litigation is derived from obligations that “arise out of or are connected with the [company’s] activities within the state.” (International Shoe, supra, 326 U.S. at pp. 319, 320.) This has become known as “specific,” or “case-linked,” jurisdiction. (Daimler, supra, 571 U.S. at p. _ [134 S.Ct. at pp. 751, 754]; Goodyear Dunlop Tires Operations, S.A. v. Brown (2011) 564 U.S. 915, 919 [131 S.Ct. 2846, 2851] (Goodyear).)
“When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. [Citation.] Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant’s burden to demonstrate that the exercise of jurisdiction would be unreasonable. [Citation.] When there is conflicting evidence, the trial court’s factual determinations are not disturbed on appeal if supported by substantial evidence. [Citation.] When no conflict in the evidence exists, however, the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record.” (Vons, supra, 14 Cal.4th at p. 449.)
Although the briefing and record at the trial court did not have the benefit of being informed by the high court’s decision in Daimler, there appear to be no material factual conflicts nor any dispute over any factual findings in the superior court. We, therefore, consider the possible exercise of each type of jurisdiction as a matter of law and on the undisputed facts.
*793 A. General Jurisdiction
1. Case law concerning general jurisdiction
The landmark 1945 decision of the United States Supreme Court in International Shoe, supra, 326 U.S. 310, serves as the starting point of modern jurisprudence concerning general jurisdiction. Although the high court resolved that case under a specific jurisdiction theory, it also described general jurisdiction as embracing “instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.” (International Shoe, supra, 326 U.S. at p. 318.) Subsequent to International Shoe, the high court has addressed the concept of general jurisdiction in only a handful of cases.
In Perkins v. Benguet Mining Co. (1952) 342 U.S. 437 [96 L.Ed. 485, 72 S.Ct. 413] (Perkins), the high court concluded that a company that had temporarily ceased mining operations abroad and had relocated its limited corporate activities to Ohio could be sued in Ohio on a cause of action unrelated to its Ohio corporate activities. (Id. at pp. 447-448.) In Perkins, because of the wartime Japanese occupation of the Philippine Islands, a Philippine corporation had ceased mining operations on all its properties there, but it maintained limited corporate activities through its president and principal shareholder who had relocated to Ohio. A shareholder then sued the company in Ohio for unpaid dividends and for its failure to issue her certificates for her shares of stock. The high court applied the standard set forth in International Shoe and concluded that the president’s business activities through his home in Ohio reflected “a continuous and systematic supervision of the necessarily limited wartime activities of the company.” (Perkins, supra, 342 U.S. at p. 448.)
The high court in Perkins explained that after the company’s mining operations ceased due to the occupation, the president of the company returned to his residence in Ohio. He kept a home office there, maintaining the company’s files. From that office he “carried on . . . correspondence relating to the business of the company and to its employees,” drew and distributed salary checks on behalf of the company, used and maintained two active Ohio bank accounts carrying substantial balances of the company’s funds, retained another Ohio bank to act as transfer agent for the stock of the company, held several directors’ meetings in his home or home office, “supervised policies dealing with the rehabilitation of the corporation’s properties in the Philippines” from his Ohio home office, and dispatched funds from Ohio to cover purchases of machinery for such rehabilitation. (Perkins, supra, 342 U.S. at p. 448.)
*794 The high court observed that although “no mining properties in Ohio were owned or operated by the company, many of its wartime activities were directed from Ohio and were being given the personal attention of its president in that State at the time he was served with summons.” (Perkins, supra, 342 U.S. at p. 448.) Thus, the company’s wartime operations had been effectively shifted almost entirely to the president’s home office in Ohio, which meant that “under the circumstances above recited, it would not violate federal due process for Ohio either to take or decline jurisdiction of the corporation in this proceeding.” (Ibid.) In other words, the requirements for the exercise of general jurisdiction were met.
In Helicopteros Nacionales de Colombia v. Hall (1984) 466 U.S. 408 [80 L.Ed.2d 404, 104 S.Ct. 1868] (Helicópteros), the high court concluded that general jurisdiction was not supported in the forum state when the defendant corporation was based abroad, had no physical presence in the forum state other than limited business purchases and contract negotiations, and the cause of action arose abroad and was unrelated to the company’s contacts with the forum state. In Helicópteros, the survivors of four United States citizens who had died in a helicopter crash in Peru filed wrongful death actions in Texas against the owner and operator of the helicopter, a Colombian corporation. (Id. at pp. 409—410.) Prior to the helicopter crash, the Colombian corporation had conducted contract negotiations in Texas with the decedents’ Texas employer to provide helicopter services, bought helicopters in Texas, and sent employees there for training, but did not conduct other operations or maintain a place of business in the state. None of the plaintiffs or their decedents resided in Texas. (Id. at pp. 410-412.) The high court concluded that neither the negotiation of a single contract and receipt of contractual payment through a Texas bank, nor the purchase of helicopters and associated employee training sessions in Texas, constituted “the kind of continuous and systematic general business contacts” that had justified general jurisdiction in Perkins. (Helicopteros, at p. 416; see id. at pp. 416—418.)
More recently, in Goodyear, supra, 564 U.S. 915 [131 S.Ct. 2846], and Daimler, supra, 571 U.S. 117 [134 S.Ct. 746], the high court significantly elaborated upon its analysis of general jurisdiction, clarifying that in order to support the exercise of general jurisdiction over a corporation its contacts with the forum state must be so extensive as to render the company essentially “ ‘at home’ ” in the state. (Daimler, supra, 571 U.S. at p. _ [134 S.Ct. at p. 751]; see Goodyear, supra, 564 U.S. at p. 919 [131 S.Ct. at p. 2851].) The United States Supreme Court’s description of general jurisdiction for purposes of the federal due process clause, as set forth in Goodyear and Daimler, is binding upon us and, as explained below, dictates the conclusion that BMS is not subject to the general jurisdiction of California courts.
*795 In Goodyear, the high court concluded that the plaintiffs failed to establish support for the exercise of general jurisdiction where the defendant companies were based abroad, sold only a limited quantity of their products in the forum state, and the cause of action—involving the defendants’ products sold abroad—also arose abroad. In that case, two young men from North Carolina were killed in a bus accident outside Paris, France. (Goodyear, supra, 564 U.S. at p. 919 [131 S.Ct. at p. 2851].) Their parents attributed the accident to an allegedly defective tire manufactured by Goodyear’s subsidiary in Turkey and filed suit in a North Carolina state court, naming Goodyear and its subsidiaries in Turkey, France, and Luxembourg as defendants. (Id. at pp. 919-920 [131 S.Ct. at pp. 2851-2852].) Although a small percentage of their tires was distributed in North Carolina by other Goodyear affiliates, the foreign subsidiaries challenged the North Carolina court’s exercise of general jurisdiction over them, contending that they did no direct business and employed no workers in North Carolina. (Id. at pp. 918, 921 [131 S.Ct. at pp. 2850, 2852].)
The high court first noted that North Carolina courts lacked specific jurisdiction to adjudicate the controversy because the accident had occurred abroad and the allegedly defective tire had been manufactured and sold abroad. (Goodyear, supra, 564 U.S. at p. 919 [131 S.Ct. at p. 2851].) The court then held that the defendant corporations’ contacts with North Carolina were also insufficient for general jurisdiction: “Unlike the defendant in Perkins, whose sole wartime business activity was conducted in Ohio, petitioners are in no sense at home in North Carolina. Their attenuated connections to the State . . . fall far short of . . . ‘the continuous and systematic general business contacts’ necessary to empower North Carolina to entertain suit against them on claims unrelated to anything that connects them to the State.” (Goodyear, supra, at p. 929 [131 S.Ct. at p. 2857], quoting Helicopteros, supra, 466 U.S. at p. 416.) The Goodyear court explained its “at home” rule for corporations as analogous to a natural person’s domicile in the forum state: “For an individual, the paradigm forum for the exercise of general jurisdiction is the individual’s domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.” (Goodyear, supra, at p. 924 [131 S.Ct. at pp. 2853-2854].)
Three years after Goodyear, in Daimler, supra, 571 U.S. 117 [134 S.Ct. 746], the court further elaborated on its articulation of the “at home” requirement. In Daimler, Argentinian residents brought an action in California against DaimlerChrysler AG (DaimlerChrysler), a German public stock company, alleging that its wholly owned subsidiary, Mercedes-Benz Argentina, had “collaborated with state security forces to kidnap, detain, torture, and kill” the plaintiffs or their relatives in Argentina during that nation’s “ ‘Dirty War.’ ” (Daimler, supra, at p._[134 S.Ct. at pp. 750-751].) The plaintiffs’ claim of general jurisdiction over DaimlerChrysler in California was based in *796 significant part on the California activities of another DaimlerChrysler subsidiary, Mercedes-Benz USA, LLC (MBUSA). Although incorporated in Delaware and headquartered in New Jersey, MBUSA had substantial facilities in California, using them to import and distribute Mercedes-Benz automobiles in the state. (Id. at p._[134 S.Ct. at pp. 751-752].)
Even attributing to DaimlerChrysler the activities of its subsidiary, MBUSA, the high court nevertheless found DaimlerChrysler’s contacts with California insufficient to justify the exercise of general jurisdiction over it. (Daimler, supra, 571 U.S. at p. _ [134 S.Ct. at p. 760].) The court reiterated its observation in Goodyear that a corporation’s state of incorporation and its principal place of business are the two “paradigm all-purpose forums.” (Daimler, supra, at p._[134 S.Ct. at p. 760].) Although it did not limit general jurisdiction to those two circumstances, the Daimler court explained that general jurisdiction may not be based merely on activities in the forum state that can be characterized as continuous and systematic; rather, the corporation’s activities must be “ ‘so “continuous and systematic” as to render [it] essentially at home in the forum State.’ ” (Id. at p._[134 S.Ct. at p. 761], quoting Goodyear, supra, 564 U.S. at p. 919 [131 S.Ct. at p. 2851].)
The Daimler court acknowledged that in an exceptional case such as Perkins “a corporation’s operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State.” (Daimler, supra, 571 U.S. at p._, fn. 19 [134 S.Ct. at p. 761, fn. 19].) The court, however, emphasized the truly “ ‘exceptional facts’ ” of Perkins, where “[g]iven the wartime circumstances, Ohio could be considered ‘a surrogate for the place of incorporation or head office.’ ” (Daimler, supra, at p._, fn. 8 [134 S.Ct. at p. 756, fn. 8].) DaimlerChrysler’s activities in California, the court observed, “plainly do not approach that level.” (Id. at p._, fn. 19 [134 S.Ct. at p. 761, fn. 19].)
Furthermore, in responding to a concurring opinion by Justice Sotomayor, the Daimler majority made clear that the general jurisdiction inquiry “does not ‘focu[s] solely on the magnitude of the defendant’s in-state contacts.’ ” (Daimler, supra, 571 U.S. at p._, fn. 20 [134 S.Ct. at p. 762, fn. 20].) Instead, general jurisdiction “calls for an appraisal of a corporation’s activities in their entirety, nationwide and worldwide.” (Ibid.) Otherwise, a corporation with significant operations in many states would be deemed at home in all of them. (Ibid.) The majority reasoned that to allow the adjudication in California of a dispute arising solely in Argentina merely based on MBUSA’s sales activities in the state would give the same global adjudicatory reach to every state in which DaimlerChrysler or its subsidiary had sizeable sales. The court rejected such an “exorbitant exercise[] of *797 all-purpose jurisdiction” because it would defeat the ability of out-of-state defendants to structure their conduct so as to have some predictability regarding the possibility of being subjected to litigation in a given forum state. {Id. at p._[134 S.Ct. at pp. 761-762].)
The high court also made clear that because the plaintiffs in Daimler had never attempted to argue that California could assert specific jurisdiction over DaimlerChrysler, the court had no reason to undertake such an analysis. (Daimler, supra, 571 U.S. at p._[134 S.Ct. at p. 758].)
2. Plaintiffs have failed to show that BMS is subject to general jurisdiction in California
The United States Supreme Court’s ‘“at home” rule for general jurisdiction over a corporation, as articulated in Goodyear and Daimler, and, to some extent Perkins, defeats the nonresident plaintiffs’ claim that California may assert general jurisdiction over BMS. BMS may be regarded as being at home in Delaware, where it is incorporated, or perhaps in New York and New Jersey, where it maintains its principal business centers. Although the company’s ongoing activities in California are substantial, they fall far short of establishing that it is at home in this state for purposes of general jurisdiction.
Similar to the California subsidiary in Daimler, BMS has sold large volumes of its products in California. Nevertheless, the high court plainly rejected the theory that a corporation is at home wherever its sales are ‘“sizeable.” (Daimler, supra, 571 U.S. at p._[134 S.Ct. at p. 761].) BMS employed approximately 164 people in California in addition to its 250 sales representatives in this state. But the company’s total California operations are much less extensive than its activities elsewhere in the United States. As noted earlier, in New York and New Jersey alone, BMS employed approximately 6,475 people, 51 percent of its United States workforce. In assessing BMS’s California business activities in comparison to the company’s business operations ‘“in their entirety, nationwide,” we find nothing to warrant a conclusion that BMS is at home in California. (Daimler, supra, at p._, fn. 20 [134 S.Ct. at p. 762, fn. 20].) As the high court warned in Daimler, to conclude that BMS may be sued in California on any cause of action, whether or not related to its activities here, under a theory of general jurisdiction, would be to extend globally the adjudicatory reach of every state in which the company has significant business operations.
The nonresident plaintiffs stress that in neither Goodyear nor Daimler did the high court strictly limit general jurisdiction to a company’s state of incorporation or its principal place of business. Nevertheless, both decisions make clear that the suitability of general jurisdiction is rooted in the concept *798 of an individual’s domicile and its equivalent place for a corporation. (Daimler, supra, 571 U.S. at p._[134 S.Ct. at p. 760]; Goodyear, supra, 564 U.S. 915 [131 S.Ct. at pp. 2853-2854].) Therefore, setting aside the state of a company’s incorporation or its headquarters, a plaintiff has the burden of showing that a company’s conduct in a given forum state may be so substantial and of such a kind as to render it at home there.
Goodyear and Daimler approved the finding of general jurisdiction in Perkins, supra, 342 U.S. 437. That case involved the exceptional fact pattern of a mining company’s wartime relocation of its overseas operations to Ohio, which functioned as the equivalent of the corporation’s headquarters through a home office in the company president’s own residence. Quite literally, the mining company in Perkins was also at home in this unique context. But nothing in the record of the present matter suggests that California has served as the equivalent of BMS’s headquarters, even temporarily.
The nonresident plaintiffs also rely on the fact that BMS has long been registered to do business in California and has maintained an agent for service of process here. California law, however, requires a foreign corporation transacting business here to name an agent in the state for service of process. (Corp. Code, § 2105, subd. (a)(5).) As the high court has explained, ‘“[t]he purpose of state statutes requiring the appointment by foreign corporations of agents upon whom process may be served is primarily to subject them to the jurisdiction of local courts in controversies growing out of transactions within the State.” (Morris & Co. v. Ins. Co. (1929) 279 U.S. 405, 408-409 [73 L.Ed. 762, 49 S.Ct. 360], italics added.) Accordingly, a corporation’s appointment of an agent for service of process, when required by state law, cannot compel its surrender to general jurisdiction for disputes unrelated to its California transactions. The “designation of an agent for service of process and qualification to do business in California alone are insufficient to permit general jurisdiction.” (Thomson v. Anderson (2003) 113 Cal.App.4th 258, 268 [6 Cal.Rptr.3d 262], citing DVI, Inc. v. Superior Court (2002) 104 Cal.App.4th 1080, 1095 [128 Cal.Rptr.2d 683]; see Gray Line Tours v. Reynolds Electrical & Engineering Co. (1987) 193 Cal.App.3d 190, 194 [238 Cal.Rptr. 419].)
Finally, the nonresident plaintiffs argue BMS is subject to general jurisdiction in California because it has contracted for distribution of Plavix with McKesson Corporation, which is headquartered in San Francisco, allowing BMS “to make a substantial profit within California through McKesson’s California contacts.” As explained above, however, BMS’s sizeable sales of its products in California are insufficient, under Goodyear, supra, 564 U.S. 915 [131 S.Ct. 2846] and Daimler, supra, 571 U.S. 117 [134 S.Ct. 746], to make it at home in this state and subject it to the general jurisdiction of our courts. *799 That some of these sales were made to or through a distributor headquartered here does not change the analysis.
As a result, we conclude that BMS is not subject to the general jurisdiction of the California courts.
B. Specific Jurisdiction
1. Case law concerning specific jurisdiction
Although the high court’s recent cases have narrowed the scope of general jurisdiction, in Daimler the majority specifically commented on the continued viability and breadth of the court’s preexisting specific jurisdiction jurisprudence. In responding to the concern expressed by Justice Sotomayor in her separate opinion in Daimler that the court was committing an injustice by limiting the availability of general jurisdiction, the majority remarked that “Justice Sotomayor treats specific jurisdiction as though it were barely there” and that “[gjiven the many decades in which specific jurisdiction has flourished, it would be hard to conjure up an example of the ‘deep injustice’ Justice Sotomayor predicts as a consequence of our holding that California is not an all-purpose forum for suits against [DaimlerChrysler].” (Daimler, supra, 571 U.S. at p._, fn. 10 [134 S.Ct. at p. 758, fn. 10].)
The basic precepts governing specific jurisdiction set forth in pre-Daimler decisions are well settled. In ascertaining the existence of specific jurisdiction, courts must analyze the “ ‘relationship among the defendant, the forum, and the litigation.’ ” (Helicopteros, supra, 466 U.S. at p. 414, quoting Shaffer v. Heitner (1977) 433 U.S. 186, 204 [53 L.Ed.2d 683, 97 S.Ct. 2569].) The question of whether a court may exercise specific jurisdiction over a nonresident defendant involves examining (1) whether the defendant has “ ‘purposefully directed’ ” its activities at the forum state (Keeton v. Hustler Magazine, Inc. (1984) 465 U.S. 770, 774 [79 L.Ed.2d 790, 104 S.Ct. 1473] (Keeton)); (2) whether the plaintiff’s claims arise out of or are related to these forum-directed activities (Helicopteros, supra, 466 U.S. at p. 414); and (3) whether the exercise of jurisdiction is reasonable and does not offend “ ‘ “traditional notions of fair play and substantial justice.” ’ ”[2] (Asahi Metal Industry Co. v. Superior Court (1987) 480 U.S. 102, 113 [94 L.Ed.2d 92, 107 S.Ct. 1026] (Asahi), quoting International Shoe, supra, 326 U.S. at p. 316.)
*800 In our own jurisprudence, we have said that a plaintiff has the initial burden of demonstrating facts to support the first two factors, which establish the requisite minimum contacts with the forum state. The burden then shifts to the defendant to show that the exercise of jurisdiction would be unreasonable under the third factor. (Snowney v. Harrah’s Entertainment, Inc. (2005) 35 Cal.4th 1054, 1062 [29 Cal.Rptr.3d 33, 112 P.3d 28] (Snowney); see also Burger King Corp. v. Rudzewicz (1985) 471 U.S. 462, 477 [85 L.Ed.2d 528, 105 S.Ct. 2174] (Burger King) [“where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable”].)
Our courts have also explained that the relatedness requirement for specific jurisdiction is determined under the “ ‘substantial connection’ test,” which “is satisfied if ‘there is a substantial nexus or connection between the defendant’s forum activities and the plaintiff’s claim.’ [Citation.]” (Snowney, supra, 35 Cal.4th at p. 1068.) This test requires courts to evaluate the nature of the defendant’s activities in the forum and the relationship of the claim to those activities in order to answer the ultimate question under the due process clause: whether the exercise of jurisdiction in the forum is fair. Under the substantial connection test, “ ‘the intensity of forum contacts and the connection of the claim to those contacts are inversely related.’ ” (Ibid.) “ ‘[T]he more wide ranging the defendant’s forum contacts, the more readily is shown a connection between the forum contacts and the claim.’ [Citation.] Thus, ‘[a] claim need not arise directly from the defendant’s forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction.’ . . . Indeed, ‘ “ ‘[o]nly when the operative facts of the controversy are not related to the defendant’s contact with the state can it be said that the cause of action does not arise from that [contact].’ ” ’ [Citation.]” (Ibid.) Finally, the defendant’s activities in the forum state need not be either the proximate cause or the “but for” cause of the plaintiff’s injuries. (Ibid.)

2. Purposeful availment

As the high court has explained, “[t]he Due Process Clause protects an individual’s liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful ‘contacts, ties, or relations,’ ” and that “[b]y requiring that individuals have ‘fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,’ ” the due process clause affords predictability and allows potential defendants to tailor their conduct “ ‘with some minimum assurance as to where that conduct will and will not render them liable to suit.’ ” (Burger King, supra, 477 U.S. at pp. 471-472.)
*801 “Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this ‘fair warning’ requirement is satisfied if the defendant has ‘purposefully directed’ his activities at residents of the forum, [citation], and the litigation results from alleged injuries that ‘arise out of or relate to’ those activities . . . .” (Burger King, supra, 471 U.S. at p. 472, fn. omitted.) These activities cannot be the result of the unilateral actions of another party or a third person, because the “ ‘purposeful availment’ requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of ‘random,’ ‘fortuitous,’ or ‘attenuated’ contacts.” (Id. at p. 475.) “When a [nonresident defendant] ‘purposefully avails itself of the privilege of conducting activities within the forum State,’ [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.” (World-Wide Volkswagen Corp. v. Woodson (1980) 444 U.S. 286, 297 [62 L.Ed.2d 490, 100 S.Ct. 559] (World-Wide Volkswagen).)
In Snowney, a California resident filed a class action in this state against a group of Nevada hotels, alleging several causes of action related to their purported failure to provide notice of an energy surcharge imposed on hotel guests. (Snowney, supra, 35 Cal.4th at pp. 1059-1060.) The hotels conducted no business and had no bank accounts or employees in California, but they advertised heavily in this state using California-based media, including billboards, newspapers, and ads aired on radio and television stations, as well as a Web site for room quotes and reservations. They also received a significant portion of their business from California residents who stayed at their hotels. (Id. at p. 1059.)
This court held that the Nevada hotels had purposefully availed themselves of the privilege of doing business in California because their Web site had touted “the proximity of their hotels to California” and provided “driving directions from California to their hotels,” thereby “specifically targeting] residents of California.” (Snowney, supra, 35 Cal.4th at p. 1064.) Furthermore, “[a]side from their Web site specifically targeting California residents, defendants advertised extensively in California through billboards, newspapers, and radio and television stations located in California” and “regularly sent mailings advertising their hotels to selected California residents.” (Id. at p. 1065.) “In doing so, defendants necessarily availed themselves of the benefits of doing business in California and could reasonably expect to be subject to the jurisdiction of courts in California.” (Ibid.)
In the present matter, there is no question that BMS has purposely availed itself of the privilege of conducting activities in California, invoking the *802 benefits and protection of its laws, and BMS does not contend otherwise. Not only did BMS market and advertise Plavix in this state, it employs sales representatives in California, contracted with a California-based pharmaceutical distributor, operates research and laboratory facilities in this state, and even has an office in the state capital to lobby the state on the company’s behalf. As in Snowney, supra, 35 Cal.4th 1054, BMS achvely and purposefully sought to promote sales of Plavix to California residents, resulting in California sales of nearly $1 billion over six years. Moreover, unlike the Nevada hotels in Snowney, BMS maintains a physical presence in California, employing well over 400 people here.
Accordingly, we conclude that BMS has purposefully availed itself of the benefits of California such that the first element of the test for specific personal jurisdiction is met concerning matters arising from or related to BMS’s contacts with the state. On the basis of these extensive contacts relating to the design, marketing, and distribution of Plavix, BMS would be on clear notice that it is subject to suit in California concerning such matters. (World-Wide Volkswagen, supra, 444 U.S. at p. 297.)
3. Arises from or is related to
As previously described, “for the purpose of establishing jurisdiction the intensity of forum contacts and the connection of the claim to those contacts are inversely related.” (Vons, supra, 14 Cal.4th at p. 452.) “[T]he more wide ranging the defendant’s forum contacts, the more readily is shown a connection between the forum contacts and the claim.” (Id. at p. 455.) Thus, “[a] claim need not arise directly from the defendant’s forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction.” (Id. at p. 452.)
In Vons, we assessed, on relatedness grounds, whether California courts could exercise specific jurisdiction over nonresident companies for causes of action involving out-of-state injuries that did not arise directly from their California contacts. (Vons, supra, 14 Cal.4th 434.) The plaintiffs in Vons were restaurant franchisees who brought an action for loss of business after contaminated hamburger meat caused illnesses in California and Washington, resulting in adverse publicity. In California, the franchisees sued two parties: the franchisor and the hamburger supplier, Vons Companies, Inc. (Vons), which processed hamburger patties in California and supplied them to the franchisor. Vons cross-complained against the franchisor and two Washington franchisees, suing them for negligence and indemnification for failing to properly cook the hamburger meat at restaurants in Washington, causing the injuries and deaths to customers there that gave rise to their joint liability with Vons. In Vons, the issue was whether the California court had specific *803 jurisdiction over these two Washington-based franchisees, Seabest Foods, Inc., and Washington Restaurant Management, Inc. (WRMI). (Id. at pp. 440-442.)
Seabest’s and WRMI’s contacts with California included food purchases from California suppliers, sending personnel to franchisor training sessions in California, remitting franchise payments to California, permitting the franchisor’s inspection of their restaurants by its California-based inspectors, and the negotiation of their franchise agreements in California, which agreements stated that any disputes would be governed by California law. Because Vons was not a party to the franchise contracts for either Seabest or WRMI, those franchisees’ contacts with California did not directly give rise to the causes of action asserted by Vons. (Vons, supra, 14 Cal.4th at p. 452.) Nevertheless, this court found personal jurisdiction was properly exercised over them in California because the forum contacts bore a substantial relation to the cause of action. We explained that requiring the two Washington franchisees to answer to Vons’s claim “is not to allow a third party unilaterally to draw them into a connection with the state; rather, it was Seabest and WRMI who established the connection.” (Id. at p. 451.)
This court further elaborated: “A claim need not arise directly from the defendant’s forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction. Rather, as long as the claim bears a substantial connection to the nonresident’s forum contacts, the exercise of specific jurisdiction is appropriate. The due process clause is concerned with protecting nonresident defendants from being brought unfairly into court in the forum, on the basis of random contacts. That constitutional provision, however, does not provide defendants with a shield against jurisdiction when the defendant purposefully has availed himself or herself of benefits in the forum.” (Vons, supra, 14 Cal.4th at p. 452.)
In the present matter, plaintiffs allege that BMS negligently designed and manufactured Plavix, failed to disclose material information in its advertising and promotion of Plavix and fraudulently and falsely advertised and promoted the product, and that BMS is liable to those who relied on such representations and were injured by Plavix. Their complaints also contend that “Plavix was heavily marketed directly to consumers through television, magazine and internet advertising.” BMS does not contest that its marketing, promotion, and distribution of Plavix was nationwide and was associated with California-based sales representatives and a California distributor, McKesson Corporation, which plaintiffs allege is jointly liable.
The California plaintiffs’ claims concerning the alleged misleading marketing and promotion of Plavix and injuries arising out of its distribution to and *804 ingestion by California plaintiffs certainly arise from BMS’s purposeful contacts with this state, and BMS does not deny that it can be sued for such claims in California. As to the nonresident plaintiffs’ claims, the Court of Appeal understood plaintiffs’ complaints as alleging that BMS sold Plavix to both the California plaintiffs and the nonresident plaintiffs as part of a common nationwide course of distribution. BMS has not taken issue with that characterization, nor has it asserted that either the product itself or the representations it made about the product differed from state to state. Both the resident and nonresident plaintiffs’ claims are based on the same allegedly defective product and the assertedly misleading marketing and promotion of that product, which allegedly caused injuries in and outside the state. Thus, the nonresident plaintiffs’ claims bear a substantial connection to BMS’s contacts in California. BMS’s nationwide marketing, promotion, and distribution of Plavix created a substantial nexus between the nonresident plaintiffs’ claims and the company’s contacts in California concerning Plavix.
Plaintiffs also allege that BMS negligently developed and designed Plavix, which serves as the basis of its claims of products liability, negligence, and breaches of express and implied warranties. BMS maintains research and laboratory facilities in California, and it presumably enjoys the protection of our laws related to those activities. Although there is no claim that Plavix itself was designed and developed in these facilities, the fact that the company engages in research and product development in these California facilities is related to plaintiffs’ claims that BMS engaged in a course of conduct of negligent research and design that led to their injuries, even if those claims do not arise out of BMS’s research conduct in this state. Accordingly, BMS’s research and development activity in California provides an additional connection between the nonresident plaintiffs’ claims and the company’s activities in California.
BMS and our dissenting colleagues attempt to characterize the claims of the California plaintiffs as “parallel” to and failing to “intersect” with the nonresident plaintiffs’ claims and argue based on this characterization that BMS’s conduct in California is insufficiently related to the nonresident plaintiffs’ claims. More specifically, BMS contends that the nonresident plaintiffs’ claims would be exactly the same if BMS had no contact whatsoever with California. This characterization ignores the uncontested fact that all the plaintiffs’ claims arise out of BMS’s nationwide marketing and distribution of Plavix. The claims are based not on “similar” conduct, as our dissenting colleagues contend, but instead on a single, coordinated, nationwide course of conduct directed out of BMS’s New York headquarters and New Jersey operations center and implemented by distributors and salespersons across the country. (See Cornelison v. Chaney (1976) 16 Cal.3d 143, 151 [127 Cal.Rptr. 352, 545 P.2d 264] [reasoning that the interstate nature of a *805 defendant’s business, while “not an independent basis of jurisdiction” weighs “in favor of requiring him to defend here”].)
Moreover, the argument that claims based on a nationwide course of conduct fail to establish relatedness for purposes of minimum contacts rests on the invalid assumption that BMS’s forum contacts must bear some substantive legal relevance to the nonresident plaintiffs’ claims, as the dissent explicitly contends. Yet in Vons, this court carefully considered and ultimately rejected such a substantive relevance requirement. (Vons, supra, 14 Cal.4th at p. 475 [“we conclude that the substantive relevance test is inappropriate”].) Rather, it is sufficient if “because of the defendants’ relationship with the forum, it is not unfair to require that they answer in a California court for an alleged injury that is substantially connected to the defendants’ forum contacts.” (Id. at p. 453.) Here, BMS’s forum contacts, including its California-based research and development facilities, are substantially connected to the nonresident plaintiffs’ claims because those contacts are part of the nationwide marketing and distribution of Plavix, a drug BMS researched and developed, that gave rise to all the plaintiffs’ claims.
BMS relies on two cases to contend that California courts may not exercise specific jurisdiction over a nonresident defendant sued by a nonresident plaintiff for injuries occurring outside the state. But in both cases, the defendant company conducted no business in California and had no employees here. (Fisher Governor Co. v. Superior Court (1959) 53 Cal.2d 222, 224 [1 Cal.Rptr. 1, 347 R2d 1] [the defendant had “no employees or property in California and has not appointed an agent to receive service of process here”]; Boaz v. Boyle & Co. (1995) 40 Cal.App.4th 700, 715 [46 Cal.Rptr.2d 888] (Boaz) [the defendant had “not been licensed to do business in California, and . . . had neither salespersons, employees or representatives here, nor any offices, bank accounts, records or property in this state”].)
Our dissenting colleagues also rely on Boaz and a pharmaceutical case from the First Circuit, Glater v. Eli Lilly & Co. (1st Cir. 1984) 744 F.2d 213, which held that specific jurisdiction had not been established because the plaintiff’s cause of action did not “arise from” the company’s forum activities. (Id. at p. 216.) Although the facts of Glater also involve the sales and marketing of an allegedly defective drug, the pharmaceutical company’s contacts with the forum state, New Hampshire, appear to have been far less substantial than BMS’s contacts to California.[3]
*806 Moreover, none of these cases had the benefit of our reasoning in Vons, where we made clear that we had adopted a sliding scale approach to specific jurisdiction in which we recognized that “the more wide ranging the defendant’s forum contacts, the more readily is shown a connection between the forum contacts and the claim.” (Vons, supra, 14 Cal.4th at p. 455.) As previously described, BMS’s contacts with California are substantial and the company has enjoyed sizeable revenues from the sales of its product here— the very product that is the subject of the claims of all of the plaintiffs. BMS’s extensive contacts with California establish minimum contacts based on a less direct connection between BMS’s forum activities and plaintiffs’ claims than might otherwise be required.
In sum, taking into account all of BMS’s activities in this state and their relation to the causes of action at issue here, we conclude that the second element of specific jurisdiction is met, and hence, absent a showing to the contrary by BMS, it would be consistent with due process for it to be subject to litigation in this state concerning injuries allegedly caused by its product Plavix, including those injuries occurring out of state. Not only did BMS purposefully avail itself of the benefits of California by its extensive marketing and distribution of Plavix in this state and by contracting with a California distributor and employing hundreds of California-based salespersons, resulting in its substantial sales of that product here, but the company also maintains significant research and development facilities in California. All of plaintiffs’ claims either arose from these activities or are related to those activities. The circumstance that numerous nonresident plaintiffs have filed their claims alongside those of resident plaintiffs does not alter or detract from this substantial nexus.
As previously discussed, the due process protections afforded by the doctrine of specific jurisdiction are designed to give a potential nonresident defendant adequate notice that it is subject to suit there, and, accordingly, a prospective defendant can assess the extent of that risk and take measures to mitigate such risk or eliminate it entirely by severing its connection with the state. (World-Wide Volkswagen, supra, 444 U.S. at p. 297.) Indeed, far from taking measures to mitigate the risk of suit in particular forums, BMS embraced this risk by coordinating a single nationwide marketing and distribution effort and by engaging in research and development in California. In that regard, BMS was on notice that it could be sued in California by nonresident plaintiffs. In fact, our courts have frequently handled nationwide class actions involving numerous nonresident plaintiffs. (See Discover Bank v. Superior Court (2005) 36 Cal.4th 148 [30 Cal.Rptr.3d 76, 113 P.3d 1100]; *807 Washington Mutual Bank v. Superior Court (2001) 24 Cal.4th 906, 915 [103 Cal.Rptr.2d 320, 15 P.3d 1071]; Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036 [80 Cal.Rptr.2d 828, 968 P.2d 539]; Rutledge v. Hewlett-Packard Co. (2015) 238 Cal.App.4th 1164 [190 Cal.Rptr.3d 411]; Canon U.S.A., Inc. v. Superior Court (1998) 68 Cal.App.4th 1 [79 Cal.Rptr.2d 897].)
To the extent that BMS’s arguments imply that a California court lacks personal jurisdiction over BMS to adjudicate the claims of the nonresident plaintiffs simply because the nonresident plaintiffs have no connection to and did not suffer any Plavix-related injuries in the state, the high court has repeatedly rejected such a focus. The minimum contacts test assesses “the relationship among the defendant, the forum, and the litigation.” (Shaffer v. Heitner, supra, 433 U.S. at p. 204.) As the high court explicitly declared in Keeton, a “plaintiffs residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant’s contacts.” (Keeton, supra, 465 U.S. at p. 780; see also Walden v. Fiore, supra, 571 U.S. _, _ [134 S.Ct. 1115, 1126] [“it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State”]; Helicopteros, supra, 466 U.S. at p. 412, fn. 5 [the plaintiffs’ “lack of residential or other contacts with Texas of itself does not defeat otherwise proper jurisdiction”]; Calder v. Jones (1984) 465 U.S. 783, 788 [79 L.Ed.2d 804, 104 S.Ct. 1482] [the “plaintiff’s lack of ‘contacts’ will not defeat otherwise proper jurisdiction”]; Rush v. Savchuk (1980) 444 U.S. 320, 332 [62 L.Ed.2d 516, 100 S.Ct. 571] [“the plaintiff’s contacts with the forum” cannot be “decisive in determining whether the defendant’s due process rights are violated”]; see also Epic Communications, Inc. v. Richwave Technology, Inc. (2009) 179 Cal.App.4th 314, 336 [101 Cal.Rptr.3d 572] [“We fail to see how the non-California residency of plaintiff can make a ‘compelling case’ ” with respect to any of the factors supporting personal jurisdiction].)
Finally, BMS and our dissenting colleagues further allege that permitting the exercise of specific jurisdiction in California for the claims of nonresidents based on the company’s nationwide sales and marketing would effectively subvert the holding of Daimler, supra, 571 U.S. 117 [134 S.Ct. 746], in which the court refused to base jurisdiction merely on nationwide sales. But BMS’s argument overstates the effect of our conclusion that specific jurisdiction is properly exercised here. Our decision does not render California an all-purpose forum for filing suit against BMS for any matter, regardless of whether the action is related to its forum activities. Rather, as with any matter concerning specific jurisdiction, the minimum contacts test is applied on a case-by-case basis, focusing on the nature and quality of the defendant’s activities in the state. (Burger King, supra, 471 U.S. at pp. 474M-75.) We simply hold under this specific set of circumstances that, for purposes of establishing the requisite minimum contacts, plaintiffs’ claims concerning the *808 allegedly defective design and marketing of Plavix bear a substantial nexus with or connection to BMS’s extensive contacts with California as part of Plavix’s nationwide marketing, its sales of Plavix in this state, and its maintenance of research and development facilities here so as to permit specific jurisdiction.
4. The reasonableness of specific jurisdiction
As previously described, after a plaintiff meets the burden of showing that a defendant has purposefully established minimum contacts with the forum state, the burden then shifts to the defendant to show that the assertion of specific jurisdiction is unreasonable because it does not comport with “ ‘traditional notions of fair play and substantial justice.’ ” (International Shoe, supra, 326 U.S. at p. 316.) BMS does not argue that the assertion of jurisdiction in this case would be fundamentally unfair, but does advance several arguments it contends defeat the claim that their causes of action arose from or are related to its contacts with California. Analytically, these arguments are more pertinent to consideration of whether the exercise of specific jurisdiction is reasonable, not whether the contested claims arise from or relate to the company’s forum activities. The questions raised by BMS—whether California has an interest in litigating the claims of nonresidents, whether BMS will unfairly bear a disproportionate burden of defending itself against all nationwide claims in a single venue of relatively few resident plaintiffs, and whether California should expend its judicial resources on the claims of nonresident plaintiffs—are all circumstances relevant to the issue of whether BMS has established that the exercise of jurisdiction is unreasonable. They do not bear upon the issue of whether the nonresident plaintiffs’ claims arise from or are related to BMS’s activities in the forum state. Accordingly, we will examine these arguments using the criteria governing reasonableness.
In determining whether the defendant has established that the exercise of specific jurisdiction is unreasonable, the court “must consider the burden on the defendant, the interests of the forum State, and the plaintiff’s interest in obtaining relief.” (Asahi, supra, 480 U.S. at p. 113.) Although it must also weigh in its determination “the interstate judicial system’s interest in obtaining the most efficient resolution of controversies[,] and the shared interest of the several States in furthering fundamental substantive social policies” (World-Wide Volkswagen, supra, 444 U.S. at p. 292), a requirement that may “reflecto an element of federalism and the character of state sovereignty vis-a-vis other States” (Insurance Corp. v. Compagnie des Bauxites (1982) 456 U.S. 694, 703, fn. 10 [72 L.Ed.2d 492, 102 S.Ct. 2099]), the due process clause “is the only source of the personal jurisdiction requirement.” {Ibid.) Accordingly, “the relationship among the defendant, the forum, and the litigation, rather than the mutually exclusive *809 sovereignty of the States . . . [is] the central concern of the inquiry into personal jurisdiction.” (Shaffer v. Heitner, supra, 433 U.S. at p. 204.)
a. The burden on defendant in litigating the claims in California
BMS complains that joining the claims of the nonresident plaintiffs to those of the comparatively smaller group of California plaintiffs would unfairly distribute the company’s burden of defending this mass tort action by requiring it to defend itself against all nationwide claims in a forum where only a minor portion of its sales occurred. However, as the Court of Appeal noted, regardless of whether California exercises jurisdiction over nonresident plaintiffs’ claims, BMS is already burdened by having to defend against the claims of 86 California plaintiffs. Certainly, the addition of 592 nonresident plaintiffs is a significant added burden, but the alternative is to litigate the claims of these other 592 nonresident plaintiffs in a scattershot manner in various other forums, in potentially up to 34 different states.[4] Such an alternative would seem to be a far more burdensome distribution of BMS’s resources in defending these cases than defending them in a single, focused forum.
Pretrial preparation and discovery concerning plaintiffs’ claims may pose challenges given the diversity of their states of residence, but, as the Court of Appeal recognized, our state’s Civil Discovery Act provides for taking depositions outside California for use at trial. (Code Civ. Proc., § 2026.010.) Moreover, information and documents relevant to plaintiffs’ requests for discovery will likely be located in New York or New Jersey, as will the individuals whom plaintiffs are likely to seek to depose, regardless of the venue in which the plaintiffs’ claims are filed.
Finally, BMS has provided no evidence to suggest that the cost of litigating plaintiffs’ claims in San Francisco is excessive or unduly burdensome for BMS compared to any other relevant forum or forums.[5] BMS, therefore, fails to show that its defense of plaintiffs’ claims in California places on it an undue burden.
*810 b. California’s interest in providing a forum for plaintiffs in this case
BMS further claims that California has no legitimate interest in adjudicating the claims of nonresidents because they have no connection to the state. Admittedly, the fact that the nonresident plaintiffs greatly outnumber the California plaintiffs does give us some pause. But in ascertaining the reasonableness of exercising specific jurisdiction, no one factor, by itself, is determinative. More important, there are identifiable interests our state holds in providing a forum for both the resident and nonresident plaintiffs.
First, evidence of other injuries is “admissible to prove a defective condition, knowledge, or the cause of an accident,” provided that the circumstances of the other injuries are similar and not too remote. (Ault v. International Harvester Co. (1974) 13 Cal.3d 113, 121-122 [117 Cal.Rptr. 812, 528 P.2d 1148]; see also Elsworth v. Beech Aircraft Corp. (1984) 37 Cal.3d 540, 555 [208 Cal.Rptr. 874, 691 P.2d 630] [evidence of prior accidents involving similar airplane with identical single-engine stall-spin characteristics was admissible].) To the extent that evidence of the injuries allegedly suffered by the nonresident plaintiffs may be relevant and admissible to prove that Plavix similarly injured the California plaintiffs, trying their cases together with those of nonresident plaintiffs could promote efficient adjudication of California residents’ claims. California, therefore, has a clear interest in providing a forum for this matter.
This interest is further underscored by the substantial body of California law aimed at protecting consumers from the potential dangers posed by prescription medication, including warnings about serious side effects and prohibiting false and misleading labeling. (See, e.g., Bus. & Prof. Code, §§ 407ÍM-078.) As this court has previously recognized, “California has a strong interest in protecting its consumers by ensuring that foreign manufacturers comply with the state’s safety standards.” (Asahi Metal Industry Co., Ltd. v. Superior Court (1985) 39 Cal.3d 35, 53 [216 Cal.Rptr. 385, 702 P.2d 543].) It also bears reemphasis that there are no fewer than 250 BMS sales representatives in California. Although at this early stage of the proceedings, the record contains very little evidence concerning the promotional and distribution activities of these sales representatives, California has a clear interest in regulating their conduct.[6] (Cf. Bus. & Prof. Code, § 17500 *811 [permitting claims by nonresidents who are deceived by representations “disseminated from” the State of California].)
In addition, California also has an interest in regulating the conduct of BMS’s codefendant, McKesson Corporation, which is headquartered in California, as a joint defendant with BMS. As noted above, in Vons, we held that specific jurisdiction was proper over cross-defendants who entered into contracts in California that gave rise to the joint liability and the corresponding right to indemnification on which the cross-claims against them were based. (See Vons, supra, 14 Cal.4th at pp. 456M-57.) California’s interest in adjudicating claims on which McKesson Corporation, a California resident, may be jointly liable with BMS, a nonresident defendant, is readily apparent. Were BMS dismissed from nonresident plaintiffs’ cases, California courts would be required to hear their claims against McKesson Corporation while the same plaintiffs litigated the same claims arising from the same facts and the same evidence against BMS in a forum potentially on the opposite side of the country.
c. Plaintiffs’ interest in a convenient and effective forum
Nonresident plaintiffs have obviously purposefully availed themselves of the jurisdiction of courts in this state by choosing to file all of their claims here—strong evidence that the forum is convenient to them. Eighty-six of the 678 plaintiffs reside in California; only Texas, with 92 plaintiffs, is home to more.
Moreover, the current forum, San Francisco Superior Court, is equipped with a complex litigation department that is well suited to expeditiously handle such large cases. BMS has not shown that this forum is inconvenient for plaintiffs.
d. Judicial economy and the shared interests of the interstate judicial system
BMS argues that it would be a waste of California’s judicial resources to provide a forum for the nonresident plaintiffs. To be sure, a single court hearing the claims of hundreds of plaintiffs is a significant burden on that court. But the overall savings of time and effort to the judicial system, both in California and interstate, far outweigh the burdens placed on the individual forum court. The alternative that BMS proposes would result in the duplication of suits in numerous state or federal jurisdictions at substantial costs to *812 both the judicial system and to the parties, who would have to deal with disparate rulings on otherwise similar procedural and substantive issues.
For claims of mass injuries stemming from a single product or event, plaintiffs often resort to the mechanism of the class action, which promotes “efficiency and economy of litigation.” (Crown, Cork. & Seal Co. v. Parker (1983) 462 U.S. 345, 349 [76 L.Ed.2d 628, 103 S.Ct. 2392].) But, unlike class actions in which common questions of law, fact, and proximate cause predominate among members of the plaintiff class, “mass-tort actions for personal injury most often are not appropriate for class action certification.” (Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 1123 [245 Cal.Rptr. 658, 751 P.2d 923].) As this court has previously recognized, “[t]he major elements in tort actions for personal injury—liability, causation, and damages—may vary widely from claim to claim, creating a wide disparity in claimants’ damages and issues of defendant liability, proximate cause, liability of skilled intermediaries, comparative fault, informed consent, assumption of the risk and periods of limitation.” (Ibid.)
Yet, because mass tort injuries may involve diverse injuries or harm not amenable to the efficiency and economy of a class action, they present special problems for the proper functioning of the courts and the fair, efficient, and speedy administration of justice. Without coordination, “those who win the race to the courthouse [and] bankrupt a defendant early in the litigation process” would recover but effectively shut out other potential plaintiffs from any recovery. (In re Exxon Valdez (9th Cir. 2000) 229 F.3d 790, 795-796.) Moreover, coordinated mass tort actions “also avoid the possible unfairness of punishing a defendant over and over again for the same tortious conduct.” (Id. at p. 796.)
It is also important to note that many of the resident plaintiffs allege that Plavix caused them to suffer heart attacks, strokes, cerebral bleeding, and gastrointestinal bleeding. These are obviously severe medical conditions, and California has an interest in ensuring that litigation brought by its residents is resolved in a timely fashion. By separating the nonresident plaintiffs from the resident plaintiffs and forcing the nonresidents to sue in other states, it is fair to anticipate delays in the California proceedings that would be created by the litigation and appeals of discovery and factual conflicts in the various other forums. In that event, the California plaintiffs’ litigation could be stalled for a significant period without resolution. Likewise, defendants would suffer the costs created by delay and uncertainty as to their potential liability, if any.
Moreover, the same concerns of delay and efficiency apply equally to the interstate judicial system. The other forums have an equally strong interest in the fair, efficient, and speedy administration of justice for both their resident *813 plaintiffs and resident defendants. The consolidation of plaintiffs’ claims in a single forum is a mechanism for promoting those interests.
Of course, the other potential forums also have a sovereign interest in seeing their laws applied to actions such as this one. But for purposes of establishing the propriety of personal jurisdiction, the high court has stated, “we do not think that such choice-of-law concerns should complicate or distort the jurisdictional inquiry.” (Keeton, supra, 465 U.S. at p. 778.) Choice-of-law concerns might very well make a mass tort action unmanageable in certain circumstances, but that issue is not determinative at this stage of the proceedings.
Accordingly, BMS has failed to carry its burden of showing that the exercise of personal jurisdiction over it in this matter is unreasonable.
III. Conclusion
We conclude that BMS, despite its significant business and research activities in California, is not at home in our state for purposes of asserting general personal jurisdiction over it. However, we conclude that in light of BMS’s extensive contacts with California, encompassing extensive marketing and distribution of Plavix, hundreds of millions of dollars of revenue from Plavix sales, a relationship with a California distributor, substantial research and development facilities, and hundreds of California employees, courts may, consistent with the requirements of due process, exercise specific personal jurisdiction over nonresident plaintiffs’ claims in this action, which arise from the same course of conduct that gave rise to California plaintiffs’ claims: BMS’s development and nationwide marketing and distribution of Plavix. BMS cannot establish unfairness: Balancing the burdens imposed by this mass tort action, and given its complexity and potential impact on the judicial systems of numerous other jurisdictions, we conclude that the joint litigation of the nonresident plaintiffs’ claims with the claims of the California plaintiffs is not an unreasonable exercise of specific jurisdiction over defendant BMS.
IV. Disposition
The judgment of the Court of Appeal is affirmed.
Liu, J., Cuéllar, J., and Kruger, J., concurred.

 A ninth case, filed in Santa Clara Superior Court by the County of Santa Clara against defendants was also joined with the other eight cases and assigned to a coordination trial judge of the San Francisco Superior Court. The complaint filed in that matter is not in the record before us nor is it a subject of dispute among the parties as to matters of personal jurisdiction.

 BMS states it is not contesting the first or third factors and that the company is contesting only whether the claims of the nonresident plaintiffs are related to its activities in California. But, as we will explain, BMS’s arguments are not as narrow as it contends. Accordingly, we will examine here all three factors relevant to the specific jurisdiction analysis.

 In addition, the dissent relies on Hanson v. Denckla (1958) 357 U.S. 235 [2 L.Ed.2d 1283, 78 S.Ct. 1228], where the plaintiffs filed suit in Florida against a Delaware-based trustee who had no purposeful contacts with Florida, other than those caused by the unilateral activity of the plaintiffs. The dissent’s reliance on this case is inapposite because the high court concluded that the defendant in that matter had not purposefully availed herself “of the privilege of *806 conducting activities within the forum State, thus invoking the benefits and protections of its laws.” (Id. at p. 253.) Here, the parties do not contest that BMS has purposefully availed itself of California law.

 Our dissenting colleagues note that nonresident plaintiffs presumably could file their' claims in Delaware or perhaps New Jersey or New York, or in federal court where they could be coordinated as part of multidistrict litigation, but nothing requires them to choose one of these forums rather than their home states.

 Of course, BMS is free to make such a showing on a motion asserting forum non conveniens. (Stangvik v. Shiley Inc. (1991) 54 Cal.3d 744, 751 [1 Cal.Rptr.2d 556, 819 P.2d 14].) We merely hold that, for purposes of defeating specific jurisdiction, BMS fails to meet its burden.

 Our dissenting colleagues contend that the record does not establish that BMS’s sales representatives misled nonresident physicians concerning the safety and efficacy of Plavix or that McKesson was responsible for providing Plavix to any of the nonresident plaintiffs. (Dis. opn. of Werdegar, J., post, at p. 821.) Certainly, the existence of such evidence would lend additional support to the question of whether the claims of the nonresident plaintiffs are not just related to but actually also arise out of BMS’s contacts with California. But our *811 discussion here is merely focused on the reasonableness of asserting specific jurisdiction in this matter because our state has an interest in regulating conduct in the pharmaceutical industry that could pose a danger to public welfare, regardless of residency.