**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**


The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

**FILED**
**APRIL 28, 2022**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SANDRA LYNNE DOWNING, individually and as Personal Representative of The Estate of Brian Downing, Deceased, and on behalf of KRISTYL DOWNING and JAMES DOWNING, Death Beneficiaries of The Estate of Brian Downing, | ) ) ) ) ) ) ) ) | No. 36298-1-III |
| Respondents, | ) ) | ORDER AMENDING OPINION FILED APRIL 14, 2022 |
| v. | ) ) | |
| BLAIR LOSVAR, Personal Representative of THE ESTATE OF ALBERT E. LOSVAR. Deceased, | ) ) ) ) | |
| Respondent, | ) ) | |
| LYCOMING, A DIVISION OF AVCO CORPORATION, a Delaware corporation and subsidiary of TEXTRON AVIATION, INC., a foreign corporation; and JOHN DOES 1-20, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| TEXTRON AVIATION, INC., a Kansas corporation formerly CESSNA, AIRCRAFT COMPANY, | ) ) ) ) | |
| Petitioner. | ) | |

IT IS ORDERED the opinion filed April 14, 2022, is amended as follows:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing v. Losvar*

The first full paragraph on page five that reads:

Pottinger, a man prouder of his aviation engineering background than his law

degree, teaches engineering at University of Southern California.

shall be deleted.

PANEL:  Judges Fearing, Siddoway, Pennell

FOR THE COURT:

_____
LAUREL H. SIDDOWAY, Chief Judge

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SANDRA LYNNE DOWNING, individually and as Personal Representative of The Estate of Brian Downing, Deceased, and on behalf of KRISTYL DOWNING and JAMES DOWNING, Death Beneficiaries of The Estate of Brian Downing, | ) ) ) ) ) ) ) ) | No. 36298-1-III |
| Respondents, | ) ) | PUBLISHED OPINION |
| v. | ) ) | |
| BLAIR LOSVAR, Personal Representative of THE ESTATE OF ALBERT E. LOSVAR. Deceased, | ) ) ) ) | |
| Respondent, | ) ) | |
| LYCOMING, A DIVISION OF AVCO CORPORATION, a Delaware corporation and subsidiary of TEXTRON AVIATION, INC., a foreign corporation; and JOHN DOES 1-20, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| TEXTRON AVIATION, INC., a Kansas corporation formerly CESSNA, AIRCRAFT COMPANY, | ) ) ) ) | |
| Petitioner. | ) | |

FEARING, J. —

"[T]his exact fact pattern (a resident-plaintiff sues a global [aviation] company, extensively serving the state market . . . for an in-state accident)'

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

also effectively functions 'as an illustration—even a paradigm example—of how specific jurisdiction works.*" Cohen v. Continental Motors, Inc.*, 2021-NCCOA-449, 864 S.E.2d 816, 827 (N.C. 2021), *review denied*, 868 S.E.2d 859 (N.C. 2022) (alterations in original) (quoting *Ford Motor Company v. Montana Eighth Judicial District Court*, ___U.S. ___, 141 S. Ct. 1017, 1028, 209 L. Ed. 2d 225 (2021)).

We're not [only] in Kansas anymore. Paraphrase of Dorothy, in *The Wizard of Oz*.

This appeal presents the first opportunity for a Washington appellate court to review and apply the United States Supreme Court's recent ruling, in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), explicating the basis for personal jurisdiction over a nonresident manufacturer. Textron Aviation Inc., the successor corporation to Cessna Aircraft Company, challenges the superior court's ruling that Washington courts possess personal jurisdiction over the aviation company in this lawsuit brought as the result of a crash of a Cessna airplane in Okanogan County. In so arguing, Textron Aviation takes flight in order to dissociate and distance itself from the company's promotional material that boasts of its manufacturing planes for a worldwide market and brags about its far ranging and quick service throughout the nation. Because the owner of the Cessna plane resided in Washington State, because the crash occurred in Washington State, because Cessna Aircraft Company possessed extensive contacts with Washington State, and because this lawsuit relates in part to those contacts, we affirm the superior court's finding of personal jurisdiction under Washington's long-arm statute and

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

the due process clause of the Fourteenth Amendment to the United States Constitution.

*Ford Motor Co. v. Montana Eighth Judicial District Court* compels our ruling.

FACTS

This lawsuit arises from the crash of a Cessna T182T Skylane, four-seat light piston-engine aircraft. The impact killed pilot Albert Losvar and passenger Brian Downing. The estate of Brian Downing initiated this suit against the estate of Albert Losvar on the theory of pilot error and failure to maintain the aircraft. After some discovery, Downing's estate concluded that the plane likely malfunctioned, and the estate added Textron Aviation Inc., the successor corporation to the manufacturer of the plane, Cessna Aircraft Company, as a defendant. The estate of Albert Losvar cross claimed against Textron Aviation.

We purloin our facts from the complaint of the estate of Brian Downing, the cross claim of the estate of Albert Losvar, and affidavits filed by the parties in support of and in opposition to Textron Aviation's motion to dismiss. These facts extend to the nature and extent of Cessna Aircraft Company's and Textron Aviation's business, Cessna's activities in Washington State, the provenance of the Cessna T182T involved in the Okanogan County crash, and the few facts known about the crash. We refer to Textron Aviation Inc. as "Textron Aviation" and its parent company Textron Inc. as "Textron." We refer to Cessna Aircraft Company as "Cessna." We refer to the respective estates

3

No. 36298-1-III
*Downing. v. Losvar*

simply as Downing and Losvar. For purposes of this appeal, Downing and Losvar hold the same interests and forward the same arguments.

Cessna designed and manufactured the T182T model aircraft in Kansas. In 2008, Cessna, not Textron Aviation, sold the Cessna T182T craft at issue to an authorized Cessna dealer in Napa, California. The Napa dealer retrieved the plane from Independence, Kansas, and the dealer later sold the plane to a customer in San Francisco. In 2012, Albert Losvar purchased the plane from the San Francisco owner.

Cessna received notice of Albert Losvar's purchase of the used plane and Losvar's Washington address. Between August 2012 and October 2014, Cessna sent Losvar, in Washington State, six notices or service bulletins concerning the Cessna T182T. For example, in March 2014, Cessna sent a service letter to Losvar explaining that a suspect fuel pump might have been installed on his plane. This service letter advised Losvar to inspect his plane's paperwork or the plane's fuel pump to determine if the suspect pump had been installed. As required by law, Textron Aviation mails service bulletins to all registered owners of aircraft covered by the given service bulletin.

On August 13, 2015, the Cessna T182T plane owned by Albert Losvar departed the airport in Oroville, Washington. Fifteen minutes after taking off, the plane crashed, killing pilot Losvar and passenger Brian Downing.

Following the crash, the National Transportation Safety Board (NTSB) examined the fuel selector valve from Losvar's plane. The NTSB found "[a] black, rigid solid"

4

No. 36298-1-III
*Downing. v. Losvar*

material inside the valve. Clerk's Papers (CP) at 722. Nevertheless, the Board could not determine the nature of the material because it had "decomposed to elemental carbon and water" when exposed to high temperatures. CP at 722.

After the NTSB's examination, an independent aviation accident investigator and reconstructionist, Mark Pottinger, concluded that the black, rigid solid substance, found in the fuel selector valve, contained glass fibers. Pottinger, a man prouder of his aviation engineering background than his law degree, teaches engineering at University of Southern California. Pottinger opined that the glass fibers likely entered the fuel system during manufacturing, and the fibers migrated through the fuel system until they completely obstructed the fuel selector valve. Textron Aviation denies any manufacturing defect and contends the material found inside the valve was deposited in the selector valve only because of the heat immediately following the crash.

Although Downing and Losvar sue Textron Aviation, we first review the background of Cessna, a predecessor company of Textron Aviation. Tinkerer Clyde Cessna built his first plane in 1911 on the Oklahoma salt plains. By 1927, Cessna, then a car dealer in Enid, Oklahoma, moved his upstart plane construction operation from Enid to Wichita, Kansas, because Enid bankers refused to lend him money. That same year, Cessna formed the Cessna Aircraft Company, which in the mid-to-late twentieth century, functioned as one of the highest volume and most diverse producers of general aviation

5

No. 36298-1-III
*Downing. v. Losvar*

aircraft. With Cessna and other plane works, Wichita vied with Seattle as Air Capital of the World.

General Dynamics purchased Cessna in 1985. In 1992, Textron Inc. purchased Cessna from General Dynamics, and Cessna for the next twelve years functioned as a subsidiary of Textron. In March 2014, Textron purchased plane manufacturers Beechcraft and Hawker Aircraft. Cessna then ceased operations as a subsidiary company of Textron and joined the two other manufacturers as one of three distinct brands produced by Textron Aviation Inc., a wholly owned subsidiary of Textron. At first Textron Aviation was the sole shareholder of Cessna. As a result of a merger in 2017, Textron Aviation became the successor corporation to Cessna. *LNS Enterprise LLC v. Continental Motors, Inc.*, 22 F.4th 852, 857 (9th Cir. 2022).

Textron Aviation, a Delaware corporation, is registered as a foreign corporation in Washington. Its headquarters lies at One Cessna Boulevard, in Wichita, Kansas. Textron Aviation continues to design and manufacture Cessna and other planes in Kansas.

In support of its motion to dismiss for lack of personal jurisdiction, Textron Aviation submitted the *Textron Inc. 2017 Fact Book* (*Fact Book*), a book concerning the parent company's operations. Textron, the parent company, is a $14.2 billion multi-industry company with 37,000 employees. According to the *Fact Book*, the Company leverages its global network of aircraft, defense, industrial, and finance businesses to provide customers with innovative products and services. The world-wide public knows

6

No. 36298-1-III
*Downing. v. Losvar*


Textron "for its powerful brands" such as Bell Helicopters, Cessna, Beechcraft, Hawker,

Jacobsen, Kautex, Lycoming, E-Z-GO, Greenlee, Textron Off-Road, Arctic Cat, Textron

Systems, and TRU Simulation + Training. According to Textron's 2017 Annual Report,

the company provides its customers with "groundbreaking technologies, innovative

solutions, and first-class service." CP at 299. Textron's stock trades on the New York

Stock Exchange. Textron garners revenue from the United States, Canada, Mexico, Latin

America, Europe, Asia Pacific, the Middle East, and Africa.

According to Textron's *2017 Fact Book*, Textron Aviation serves as an important

subsidiary. The *Fact Book* reads:

> Textron Aviation is home to Beechcraft, Cessna, and Hawker
> aircraft brands and continues to lead general aviation through two principal
> lines of business: aircraft and aftermarket. Aircraft includes sales of
> business jet, turboprop and piston aircraft, as well as special mission and
> military aircraft. Aftermarket includes parts sales, maintenance, inspection,
> and repair services.

CP at 300. "Textron Aviation markets its products worldwide through its own sales

force, as well as through a network of authorized independent sales representatives." CP

at 311. Textron Aviation represented one-third of Textron's revenue in 2017.

Textron's 2017 Annual Report recounted the activities of Textron Aviation for

2017.

> In November, Textron Aviation introduced the Cessna SkyCourier, a
> new twin-engine, large-utility turboprop. Textron Aviation collaborated
> with FedEx Express to develop the performance specifications for the cargo

No. 36298-1-III
*Downing. v. Losvar*

version of the SkyCourier and signed on as its launch customer with an initial order for 50 aircraft and an option to order 50 more.

Textron Aviation also continued development of the single-engine Cessna Denali turboprop. These new aircraft, together with the King Air and Caravan product lines, will represent the most comprehensive turboprop product lineup in the market and provide our customers with solutions to their aircraft needs for years to come.

On the military side at Textron Aviation, our Scorpion jet and AT-6 Wolverine both performed extremely well during August's U.S. Air Force (USAF) OA-X light attack demonstration program at Holloman Air Force Base in New Mexico. This exercise represented an important step in the USAF's evaluation of its needs for a future light attack jet.

CP at 301-02.

According to Textron's 2017 annual report:

On December 30, 2017, we operated a total of 63 plants located throughout the U.S. and 52 plants outside the U.S. We own 61 plants and lease the remainder for a total manufacturing space of approximately 24.6 million square feet. . . . We also own or lease offices, warehouses, training and service centers and other space at various locations.

CP at 322. This entry in the annual report does not distinguish between plants and facilities operated by Textron Aviation and other subsidiaries of Textron Inc. or identify the states in which the plants are located. Near the conclusion of the annual report, Textron boasted:

With a strong lineup of products and a *local presence around the world*, we captured new business in highly competitive market segments.

CP at 303 (emphasis added). Textron's board of directors includes one retired secretary of the Air Force and a retired general in the Marine Corps.

8

No. 36298-1-III
*Downing. v. Losvar*


On its website, Textron Aviation maintains a page that poses the question: "WHY

TEXTRON AVIATION SERVICE?"  CP at 681.  The page answers the question with

the phrases: "Global AOG [Aircraft-On-Ground] Support," "Knowledge," and "Quality

Parts."  The webpage pictures a globe with a hand holding a wrench extending from the

globe above each of the three terse answers.  The page reads:

> No one knows your aircraft like the people who built it, and our
> expertise is just beginning.  We offer *general aviation's farthest reaching
> service networ*k, which includes company-owned facilities throughout the
> world, mobile and airborne service during AOG events, and parts that ship
> the day you order them.

CP at 681 (emphasis added).  The webpage lists a phone number to call for service or

parts.  We do not know the date this webpage was accessed.  The site lists a mobile

service unit located at Boeing Field in Seattle.

Also on a Textron Aviation website, the company writes:

> Ever wish you had a maintenance director to watch over your
> aircraft?  With the new Customer Portal, maintenance management is
> transformed into a fast, easy-to-manage process you can oversee—and
> control—from anywhere.
> Designed to function as a virtual director of maintenance, the portal
> provides a clear view into the service hangar and beyond. . . .
> . . . .
> TEXTRON AVIATION SERVICE: KEEPING YOU FLYING
> From service on your terms to unique modifications and upgrades,
> our customer service is equipped to handle all your service needs.
> . . . .
> Global Service Network
> Our goal at Textron Aviation is to be there for you when and *where
> you need us*.  If one of our 19 world-wide company owned service facilities
> is not convenient, we'll dispatch one of our 60 Mobile Service Units to

9

No. 36298-1-III
*Downing. v. Losvar*

> come to you. Additionally with just 1CALL (+ 1.316.517.2090) our technical experts can provide immediate aircraft support and also assist you with any requests regarding maintenance, inspections, parts, repairs, avionics upgrades, equipment installations, part services, and much more.
>
> . . . .
>
> MOBILE SERVICE UNITS
>
> . . . .
>
> Textron Aviation set the standard in the mobile service industry and now dispatches more than 60 mobile units around the world. Our Mobile Service Units are equipped to respond to AOG, unscheduled and scheduled aircraft service. These vehicles are ready to perform limited inspections, engine, tire, and brake service on your aircraft—all *at your location*. Save time, lower costs, and reduce flight cycles with our MSU program.
>
> Air Response Services
>
> Textron Aviation support aircraft are used to rush technicians and parts in response to AOG situations. Available 18 hours a day, 7 days a week including most holidays, with a 5 hour reach.
>
> . . . .
>
> Service Engineers and Mechanics
>
> Textron Aviation deploys necessary personnel that bring expertise, diagnostic support and parts to your location to quickly return your aircraft to flight status.

CP at 689-98 (emphases added) (boldface omitted). The website lists seven authorized Cessna service centers in Washington State: Everett, Kenmore, Renton, Pullman, Gig Harbor, Seattle, and Vancouver.

Textron's *Fact Book* and annual report recognize a financing arm of Textron that helps to finance purchases of Textron Aviation planes. Textron Financial Corporation's address is Two Cessna Boulevard, Suite 100, Wichita, next door to Textron Aviation's headquarters. According to the *Fact Book*,

> Our finance segment operated by Textron Financial Corporation (TFC), is a commercial finance business that provides financing solutions

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

> for purchasers of Textron products, *primarily Textron Aviation* aircraft and Bell helicopters. For more than five decades, TFC has played a key role for Textron customers around the globe.

CP at 300 (emphasis added).

Cessna Finance Corporation, presumably a forerunner to Textron Financial Corporation, has brought lawsuits in Pierce County and King County Superior Court. Cessna Aircraft Company was a third-party plaintiff in a wrongful death suit brought in Pierce County.

According to a declaration signed by an officer of Textron Aviation, at the time of the Okanogan County crash in 2015, the airplane manufacturer, of which Cessna is a part, employed 8,400 individuals, with four employees in Washington State. Textron Aviation's four Washington employees consisted of two sales employees and two mechanics. These four employees worked from an office space that Textron Aviation sublet from another company in Seattle. Textron Aviation does not own any real estate in Washington. Textron Aviation does not publish advertisements specifically targeted to Washington residents. In 2015, Textron Aviation's Washington revenue accounted for less than one percent of the company's total revenue.

In 2016, one year after the crash in Okanogan County, Textron Aviation ended its dealer network for Cessna aircraft and switched to a direct sales model in the contiguous United States. The company replaced dealers with regional sales representatives.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*


In opposition to Textron Aviation's motion to dismiss, a former Cessna aviation mechanic and customer solutions manager, Keryan Walsh, declared that Washington maintains a strong market for Cessna aircraft. Eastern Washington's flat terrain with access to landing strips renders the area a popular venue for Cessna planes. As of 2018, 3,040 Cessna planes were registered in Washington.

From experience, Keryan Walsh knows that Cessna maintains a mobile response team in Washington State and that Cessna only places mobile response teams in states with a significant market. The mobile response team functions in part as advertising for Cessna. The name "Cessna" is written on the highly equipped mobile response truck, and the truck operates as a mobile billboard for the airplane manufacturer. Cessna personnel in Washington State wear uniforms with "Cessna" written thereon.

According to Keryan Walsh, when a purchaser buys a Cessna aircraft, Cessna informs the purchaser about the mobile response teams' locations. Additionally, through Textron Aviation's website, the company provides owners with access to information about pilot centers and service locations. According to Walsh, an individual will more likely purchase a Cessna with the peace of mind knowing that he or she can obtain product support in his or her home state. Cessna prides itself in "excellent customer support." CP at 726.

No. 36298-1-III
*Downing. v. Losvar*

PROCEDURE

In 2017, Sandra Downing, on behalf of herself and her children and as personal representative of Brian Downing's estate, filed a complaint for injuries and wrongful death against Blair Losvar in his capacity as the personal representative of Albert Losvar's estate. Downing, through a stipulation with Losvar, amended her complaint to add Lycoming, the manufacturer of the Cessna T182T's engine, and Textron Aviation as additional defendants. Lycoming is an operating division of AVCO Corporation, also a wholly owned subsidiary of Textron Inc. When answering the complaint of Downing, Losvar asserted a cross claim against Lycoming and Textron Aviation. Both Losvar and Downing allege claims of negligence, violation of the Washington product liability act, strict liability, and breach of warranty. The allegations include a claim of a failure to warn about the dangerous aircraft and its constituent parts. Downing and Losvar allege that Washington courts possess jurisdiction over Lycoming and Textron Aviation because both companies regularly conduct business in Washington State.

In July 2018, Textron Aviation moved to dismiss Downing's complaint and Losvar's cross claim due to lack of personal jurisdiction. Lycoming did not join in the motion. The superior court denied the motion.

This court accepted Textron Aviation's petition for discretionary review. In January 2020, we stayed the appellate proceedings until the United States Supreme Court

13

No. 36298-1-III
*Downing. v. Losvar*

issued its opinion in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S.

Ct. 1017 (2021).

LAW AND ANALYSIS

The sole issue on appeal is whether Washington courts possess personal

jurisdiction over Textron Aviation for purposes of the claims asserted by Downing and

Losvar.  We answer in the affirmative.

Procedure

This court reviews de novo a trial court's denial of a motion to dismiss for lack of

personal jurisdiction.  *State v. LG Electronics, Inc.*, 186 Wn.2d 169, 176, 375 P.3d 1035

(2016).  The Okanogan County Superior Court resolved the motion to dismiss for lack of

jurisdiction without entertaining live testimony and cross-examination.  When a trial

court decides a motion to dismiss for lack of personal jurisdiction without an evidentiary

hearing, the plaintiff's burden is a prima facie showing of jurisdiction.  *State v. LG

Electronics, Inc.*, 186 Wn.2d 169, 176 (2016).

*Black's Law Dictionary* defines a "prima facie" case as sufficient to establish a

fact or raise a presumption, unless disproved or rebutted, based on what seems true on

first examination, even though it may later be proved to be untrue.  BLACK'S LAW

DICTIONARY (11th ed. 2019).  Washington cases variously define the term.  The phrase

"prima facie" denotes evidence of sufficient circumstances which would support a logical

and reasonable inference of the facts sought to be proved.  *State v. Vangerpen*, 125

14

No. 36298-1-III
*Downing. v. Losvar*

Wn.2d 782, 796, 888 P.2d 1177 (1995). This court has referred to prima facie evidence as sufficient foundational facts when assuming the truth of the evidence presented by the party carrying the burden of proof and all reasonable inferences from that evidence in a light most favorable to the party. *State v. Brown*, 145 Wn. App. 62, 69, 184 P.3d 1284 (2008). A prima facie case relies on evidence to be weighed, but not necessarily accepted by a jury or other trier of the fact. *Nopson v. City of Seattle*, 33 Wn.2d 772, 811-12, 207 P.2d 674 (1949). When the trial court enters no findings of fact, we imply all relevant facts necessary to support the trial court's order affirming jurisdiction to the extent supported by evidence. *Cirrus Design Corp. v. Berra*, 633 S.W.3d 640, 649 (Tex. App. 2021).

Based on the burden of proof and our standard of review, we focus on Downing's and Losvar's evidence and view their evidence in the light most favorable to them. This standard echoes the test for summary judgment proceedings. *CTVC of Hawaii, Co. v. Shinawatra*, 82 Wn. App. 699, 708, 919 P.2d 1243 (1996). We go further and also treat the allegations in the complaint as established. *CTVC of Hawaii, Co. v. Shinawatra*, 82 Wn. App. 699, 708 (1996).

Concept of Personal Jurisdiction

Personal jurisdiction refers to the power of a court over the person of the defendant. *State v. Fassero*, 256 S.W.3d 109, 117 (Mo. 2008). Personal jurisdiction affords a tribunal the prerogative to subject and bind a particular person or entity to its

15

No. 36298-1-III
*Downing. v. Losvar*

decisions. *RFD-TV, LLC v. WildOpenWest Finance, LLC*, 288 Neb. 318, 325, 849 N.W.2d 107 (2014); *Cagle v. Clark*, 401 S.W.3d 379, 389 (Tex. App. 2013).

A court's exercise of personal jurisdiction over a nonresident defendant requires compliance with both the relevant state long-arm statute and the Fourteenth Amendment's due process clause. *Daimler AG v. Bauman*, 571 U.S. 117, 125, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014). Some states ignore the language of their respective long-arm statute and simply assume personal jurisdiction over a defendant if federal constitutional principles allow jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (applying California law); *LNS Enterprises LLC v. Continental Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) (applying Arizona law); *Cirrus Design Corp. v. Berra*, 633 S.W.3d 640, 647 (Tex. App. 2021). In such cases, the statutory assessment of jurisdiction collapses into a constitutional one, and the court does not examine the language of the statute. *Carty v. Beech Aircraft Corp.*, 679 F.2d 1051, 1058 (3d Cir. 1982) (referencing Pennsylvania law). Some state statutes even expressly extend personal jurisdiction to the full extent as allowed by the United States Constitution. CAL. CIV. PROC. CODE, § 410.10 (California); LA. REV. STAT. § 13:3201(B) (Louisiana); OKLA. STAT. tit. 12, § 2004(F) (Oklahoma); 42 PA. CONS. STAT. § 5322(b) (Pennsylvania).

Relevant to this case, Washington's long-arm statute permits jurisdiction over:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

> (1) Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts in this section enumerated, thereby submits said person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:
> (a) The transaction of any business within this state;
> (b) The commission of a tortious act within this state.

RCW 4.28.185. Despite the existence of the statute, the Washington Supreme Court has consistently ruled that the state long-arm statute permits jurisdiction over nonresident individuals and foreign corporations to the extent permitted by the due process clause of the United States Constitution. *Noll v. American Biltrite, Inc.*, 188 Wn.2d 402, 411, 395 P.3d 1021 (2017); *Pruczinski v. Ashby*, 185 Wn.2d 492, 500, 374 P.3d 102 (2016); *Shute v. Carnival Cruise Lines*, 113 Wn.2d 763, 766-67, 783 P.2d 78 (1989); *Deutsch v. West Coast Machinery Co.*, 80 Wn.2d 707, 711, 497 P.2d 1311 (1972).

Textron Aviation does not argue that Washington's long-arm statute fails to afford jurisdiction over it. Presumably, the plane manufacturer either transacted business in Washington State or committed a tort herein within the meaning of RCW 4.28.185. When determining whether a tortious act occurred in Washington, the court identifies the last event necessary to render the defendant liable, which, in this appeal, would be the crash in Washington State. *CTVC of Hawaii, Co. v. Shinawatra*, 82 Wn. App. 699, 717-18 (1996).

We concentrate on constitutional limitations, rather than RCW 4.28.185 strictures. In our analysis, we spotlight United States Supreme Court decisions.

17

No. 36298-1-III
*Downing. v. Losvar*

The due process clause of the Fourteenth Amendment to the United States Constitution limits the power of a state court to assert personal jurisdiction over nonresidents of the state. *Bristol-Myers Squibb Co. v. Superior Court*, ___ U.S. ___, 137 S. Ct. 1773, 1779, 198 L. Ed. 2d 395 (2017). Because a state court's assertion of jurisdiction exposes defendants to the state's coercive power, personal jurisdiction falls within the parameters of the clause. *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1779 (2017). The due process clause not only requires the fulfillment of fair procedural rules when overseeing litigation, but also denies the prerogative of imposing judicial process altogether in some instances.

The United States Supreme Court justifies limits to personal jurisdiction under the due process clause on various interests and policies. Sometimes the Court promotes states' rights or federalism as the reason for restricting personal jurisdiction. According to the Court, the States retain many essential attributes of sovereignty, including the sovereign power to try causes in their courts. *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017). The sovereignty of each state implies a limitation on the sovereignty of all sister states. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another state, even if the forum state holds a strong interest in applying its law to the controversy, and even if the forum state serves as the most convenient location for

18

No. 36298-1-III
*Downing. v. Losvar*

litigation, the due process clause, acting as an instrument of interstate federalism, may sometimes act to divest the state of its power to render a valid judgment. *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780-81 (2017).

In other decisions, the United States Supreme Court spurns state sovereignty as a rationalization for constraints on personal jurisdiction and instead forwards jurisdictional constraints as a matter of individual liberty. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). Due process protects the individual's right to be subject only to lawful power. *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 877, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011). Apparently, the notion of individual liberty, in this context, extends to corporations.

Under former practice, a state gained jurisdiction over a person only if the person was served with process in the state or, in some instances, owned property, inside the state, that could be seized. *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 733, 24 L. Ed. 565 (1877). In the canonical decision, *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945), if not before, the United States Supreme Court abandoned this rule. The Court instead asked whether a defendant had "minimum contacts" with the forum state such that a suit does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Since *International Shoe*, the primary focus of a personal jurisdiction inquiry has been the defendant's relationship to the forum state. *Walden v. Fiore*, 571 U.S. 277, 283-

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

84, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014). Under the minimum contacts test, no binding judgment may be rendered against a person unless the person has meaningful contacts, ties, or relations with the forum jurisdiction. *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).

Courts acknowledge two types of personal jurisdiction: general or all-purpose jurisdiction, and specific or case-linked jurisdiction. *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1779-80 (2017). Both forms of jurisdiction require minimum contacts. The due process clause mentions no categories of personal jurisdiction, let alone any reference to jurisdiction. No case has explained why notions of fairness underpinning the due process clause dictate any boundary between specific and general personal jurisdiction.

A company subjects itself to general jurisdiction when its activities are so continuous and systematic as to render itself at home in the forum state. A company is at home in its state of incorporation, in the location of its principal place of business, and in any other state where its activities are substantial, continuous, and systematic as to make the state "a home." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1024 (2021); *Goodyear Dunlop Tires Operations, SA v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011). A court with general personal jurisdiction may hear any claim against the defendant, even if all the incidents underlying the claim occurred in a different state. *Bristol-Myers Squibb Co. v. Superior Court*, 137

No. 36298-1-III
*Downing. v. Losvar*

S. Ct. 1773, 1780 (2017).  In such an instance, the court may address events and conduct occurring anywhere in the world.  *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1024 (2021).  Downing and Losvar do not claim Washington courts hold general jurisdiction over Textron Aviation.

Specific jurisdiction covers a narrower class of claims when a defendant maintains a less intimate connection with a State.  *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1024 (2021).  For specific personal jurisdiction over a nonresident defendant, the plaintiff's claims must "'arise out of or relate to'" the defendant's contacts with the forum state.  *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1025 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017)); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985); *Helicopteros Nacionales de Colombia, SA v. Hall*, 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984).  Specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.  *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017).

The minimum contacts test is not a mechanical or quantitative test but a question of reasonableness.  *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).  The test is flexible.  *International Shoe Co. v. Washington*, 326 U.S. at 319.  The court reviews both the quantity and quality of the contacts.  *Burger King Corp. v. Rudzewicz*,

21

No. 36298-1-III
*Downing. v. Losvar*

471 U.S. 462, 474-75 (1985).  The facts of each case must be examined carefully and weighed to determine whether the requisite contacts exist, and courts look to the totality of defendant's contacts with the forum state.  *Kulko v. Superior Court*, 436 U.S. 84, 92, 98 S. Ct. 1690, 56 L. Ed. 2d 132 (1978).  Relevant caselaw involves extended discussion of the facts as related to the nonresident defendant's contacts with the forum state.  Many personal jurisdiction questions arise in product liability cases.

A concurrence in *International Shoe Co. v. Washington* suggested a loose, undefined, and noncategorical standard of fair play and substantial justice to determine personal jurisdiction particularly because of the abstract temperament of due process.  *International Shoe Co. v. Washington*, 326 U.S. 310, 325-26 (1945) (Black, J., concurring).  Nevertheless, based on factors discussed by the majority in *International Shoe Co.*, later decisions have applied an ephemeral three-part test for assessing specific personal jurisdiction over a defendant, who does not reside in the forum state.  First, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State."  *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958).  Second, the plaintiff's claims or claims must "'arise out of or relate to the defendant's contacts with the forum.'"  *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1025 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017)).  Third, the assertion of personal

22

No. 36298-1-III
*Downing. v. Losvar*

jurisdiction must comport with fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).

None of the three constituent elements for specific personal jurisdiction specifically mention the need for minimum contacts. Some courts suggest the first prong addresses minimum contacts. *Cirrus Design Corp. v. Berra*, 633 S.W.3d 640, 647 (Tex. App. 2021). But the notion of minimum contacts hovers over each of the trio of elements. In turn, factors considered important for one element bear relevance to the other two elements.

The plaintiff bears the burden of satisfying the first two prongs of the specific personal jurisdiction test. *LNS Enterprises LLC v. Continental Motors, Inc.*, 22 F.4th 852, 859 (9th Cir. 2022). One court has stated that, when considering the first two prongs, a strong showing on one axis will permit a lesser showing on the other. *LNS Enterprises LLC v. Continental Motors, Inc.*, 22 F.4th at 859.

Before addressing the three-part test, we must decide the nature and extent of the contacts with Washington State that we attribute to defendant Textron Aviation. Neither party suggests we encompass within our sweep of contacts the interactions that Textron Aviation's parent company, Textron Inc., has maintained with Washington State, even though Textron Aviation submitted significant data about its parent company. We decline to decide whether to include Textron Inc.'s contacts, because we may rule in favor of Downing and Losvar regardless.

23

No. 36298-1-III
*Downing. v. Losvar*

The parties presume that we include the contacts that the predecessor company, Cessna, maintained with the Evergreen State. Based on case law, we agree with this assumption. When two companies act together, one company is the alter ego of the other, or one company is the successor to the other, the court assesses the contacts of each company. *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th Cir. 2010); *Frito-Lay North America, Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 868 (E.D. Tex. 2012); *In re Commodity Exchange, Inc.*, 213 F. Supp. 3d 631, 680 (S.D.N.Y. 2016); *Jordan v. Maxfield & Oberton Holdings LLC*, 173 F. Supp. 3d 355, 361-62 (S.D. Miss. 2016); *Bridge Street Automotive, Inc. v. Green Valley Oil, LLC*, 985 F. Supp. 2d 96, 112-14 (D. Mass. 2013); *RMS Titanic, Inc. v. Zaller*, 978 F. Supp. 2d 1275, 1301-02 (N.D. Ga. 2013); *Hunter v. Deutsche Lufthansa AG*, 863 F. Supp. 2d 190, 199 (E.D.N.Y. 2012); *Idaho v. M.A. Hanna Co.*, 819 F. Supp. 1464, 1477 (D. Idaho 1993); *Bridges v. Mosaic Global Holdings, Inc.*, 2008-0113 (La. App. 1 Cir. 10/24/08); 23 So. 3d 305, 316-17; *Jeffrey v. Rapid American Corp.*, 448 Mich. 178, 190-91, 529 N.W.2d 644 (1995). While recognizing that a successor corporation by merger or consolidation embodies the predecessor, decisions have imputed the forum contacts of the predecessor to prevent formalistic changes from immunizing the successor from suit in the forum when its predecessor would have been subject to personal jurisdiction. *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982), *aff'd sub nom. Pallas Shipping Agency, Ltd. v. Duris*, 461 U.S. 529, 103 S. Ct. 1991, 76 L. Ed. 2d 120 (1983). States share an interest in

24

No. 36298-1-III
*Downning. v. Losvar*

preventing corporations from escaping jurisdiction by mergers and in making businesses bear the burden of placing defective products in commerce. *Jeffrey v. Rapid America Corp.*, 448 Mich. 178, 204-05 (1995).

At the time of Albert Losvar's purchase of the Cessna T182T in 2012, Cessna Aircraft Company functioned as a subsidiary of Textron. In 2015, at the time of the crash, Cessna ceased operations as an independent subsidiary, but functioned as a wholly owned company of Textron Aviation. Therefore, we principally analyze Cessna's, not Textron Aviation's, contacts with Washington.

Textron Aviation argues that we should assess its contacts with Washington State by limiting our review only to the model of airplane relevant to this suit, the Cessna T182T Skylane. In other words, Textron Aviation advocates a product specific test. We reject such a test.

In *Bader v. Avon Products, Inc.*, 55 Cal. App. 5th 186, 269 Cal. Rptr. 3d 318 (2020) conflicts with Textron Aviation's product specific test. The estate of Patricia Schmitz sued Avon Products in California. The estate claimed that Schmitz's use of Avon talc powder products containing asbestos caused Schmitz's mesothelioma and death. Avon Products sought to dismiss the suit based on a lack of personal jurisdiction. According to Avon Products, it marketed two distinct product lines, talc with asbestos and talc without asbestos. The trial court dismissed the suit because, although Avon Products marketed goods in all fifty states, the estate failed to show that the claim arose

No. 36298-1-III
*Downing. v. Losvar*

from talc powder that contained asbestos as opposed to talc powder without asbestos. Therefore, according to the trial court, the estate failed to show that its claims "were related to or arose" from Avon's contacts. *Bader v. Avon Products, Inc.*, 269 Cal. Rptr. 3d 318, 320 (2020). Thus, the trial court analyzed jurisdiction based on the specificity of not only the Avon product but a subcategory of the product. On appeal, the appellate court ruled that the estate need not prove that the products used by Schmitz contained asbestos. At the jurisdictional stage, courts reference "allegedly defective products." *Bader v. Avon Products, Inc.*, 269 Cal. Rptr. 3d 318, 327 (2020). Thus, whether the plaintiff, at the jurisdictional stage, may establish a specific product caused her injury lacks relevance as long as the defendant has engaged in those activities that should lead the manufacturer to anticipate being summoned into the forum court. Because Avon Products sent its Avon ladies marching from door to door throughout California, the California courts held personal jurisdiction over the company regardless of the specific product at issue.

Textron Aviation contends that the United States Supreme Court, in *Ford Motor Co. v. Montana Eighth Judicial District Court*, adopted and applied a specific product or "kind of product" test. The Supreme Court sometimes referred to the marketing of a product, i.e., a single product line, but the Court did not base its ruling on whether Ford marketed the model of car involved in the accidents in the respective states.

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

We wonder where Textron Aviation's product-specific test would end. Presumably, the colors of its planes would make no difference for purposes of minimum contact analysis. But Textron Aviation might argue that we should only include the presence of a particular year's model when assessing contacts. Regardless, in its promotion of sales and service, Textron Aviation did not distinguish between the various models of planes. Textron Aviation promoted itself holistically as a worldwide manufacturer and servicer of aircraft.

Textron Aviation contends that its sales representatives in Washington State currently market only expensive business jets and that Textron Aviation mechanics, working from Seattle, currently fix only big-ticket business jets, not piston engine planes. Nevertheless, during summary judgment proceedings, Textron Aviation presented no testimony establishing this limitation of product sales and service. The promotional material presented by Textron Aviation boasts of excellent service at the location of the customer's plane. Textron Aviation does not deny that it sold and serviced scores of Cessna T182T Skylanes in Washington State at the time Albert Losvar purchased his Cessna aircraft. Keryan Walsh testified, without distinguishing between models of planes, that Washington Cessna owners purchased their planes in part because of the service provided in this state. We must draw all reasonable inferences from the facts in favor of Downing and Losvar.

27

No. 36298-1-III
*Downing. v. Losvar*


Purposeful Availment

We begin the three-step analysis with a discussion of purposeful availment. For a state to gain personal jurisdiction over a corporation, a defendant must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum state. *Walden v. Fiore*, 571 U.S. 277, 284-85 (2014). A defendant purposefully avails itself when it reaches out beyond its home state and into another in order to "'deliberately exploi[t]' a market in the forum State." *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (alteration in original) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984)). In contrast, a defendant's contacts with a forum state do not support purposeful availment when those contacts are "'random, isolated, or fortuitous.'" *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1025 (2021) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)). Because the contacts with the forum state must be purposeful, the relationship must arise out of the contacts that the defendant itself creates with the forum and not the acts between the plaintiff or third parties and the forum state. *Walden v. Fiore*, 571 U.S. 277, 284-85 (2014).

The United States Supreme Court employs the purposeful availment element so that a corporation can choose whether to conduct business in a particular state before subjecting itself to jurisdiction there. The company can avoid sending products to a state in order to alleviate the risk of burdensome litigation. *Burger King Corp. v. Rudzewicz*,

28

No. 36298-1-III
*Downing. v. Losvar*

471 U.S. 462, 472 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Nevertheless, no reported decision suggests any corporation has commenced steps to avoid being sued in a state.  Corporations relish marketing products in as many states as possible.  Textron Aviation does not contend it or Cessna Aircraft Company took any steps to avoid jurisdiction in Washington State.

Even one action or contact with the forum state may justify personal jurisdiction over a corporation when that contact creates a substantial connection with the forum. *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957).  Because of a significant amount of business being conducted by mail and wire communications across state lines, physical presence is not necessary to satisfy the constitutionally-mandated requirement of minimum contacts.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Nevertheless, physical entry into the state, either by the defendant in person or through an agent, goods, mail, or some other means, is a relevant contact.  *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

Generally, when the defendant circulates products throughout the nation and a product causes damage in a targeted state, that state gains jurisdiction.  *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984).  Stated differently, when a corporation delivers products into the stream of commerce with the expectation that consumers will purchase the goods in the forum state, that state gains personal jurisdiction over the corporation.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980).

29

No. 36298-1-III
*Downing. v. Losvar*

Designing the product for the market in the forum state, advertising in the forum state, establishing channels for providing regular advice to customers in the forum state, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum state entail purposeful availment. *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 112, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (plurality opinion). Nevertheless, the mobility of a product, such as a car, does not control. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980).

In a products liability action, a nonresident manufacturer, who sells its products under circumstances such that it knows or should reasonably anticipate that the products will ultimately be resold in a particular state, has purposefully availed itself of the market for its products in that state. *Weight v. Kawasaki Motors Corp., U.S.A.*, 604 F. Supp. 968, 970-71 (E.D. Va. 1985). Therefore, when a products liability claim arises from the manufacture of products presumably sold in contemplation of use in the forum state, personal jurisdiction can be exercised over the nonresident manufacturer even though the purchase was made from an independent middleman or someone other than the defendant shipped the product into the forum state. *Le Manufacture Francaise Des Pneumatiques Michelin v. District Court*, 620 P.2d 1040, 1045 (Colo. 1980); *Bush v. BASF Wyandotte Corp.*, 64 N.C. App. 41, 46-51, 306 S.E.2d 562 (1983). The fact that the manufacturer deals with the residents of the state indirectly rather than directly is not determinative. *Connelly v. Uniroyal, Inc.*, 75 Ill. 2d 393, 405, 389 N.E.2d 155, 27 Ill. Dec. 343 (1979).

30

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

The continuing conduct of a nonresident defendant intended to preserve and enlarge an active market in the forum state constitutes purposeful activity in the forum state and indicates that the presence of the defendant's products in the forum state is not fortuitous, but the result of deliberate sales efforts. *Ruckstuhl v. Owens Corning Fiberglas Corp.*, 98-1126 (La. 4/13/99), 731 So.2d 881, 889-90.

Modern commerce demands personal jurisdiction throughout the United States of large manufacturers. The framers of the United States Constitution, when drafting the commerce clause, desired a common market with the states debarred from acting as separable economic entities. In fulfillment of Treasury Secretary Alexander Hamilton's vision of this nation as monolithic manufacturing engine, the United States developed and now maintains the strongest, unified industrial economy in the world.

> The vast expansion of our national economy during the past several decades has provided the primary rationale for expanding the permissible reach of a State's jurisdiction under the Due Process Clause. By broadening the type and amount of business opportunities available to participants in interstate and foreign commerce, our economy has increased the frequency with which foreign corporations actively pursue commercial transactions throughout the various States. In turn, it has become both necessary and, in my view, desirable to allow the States more leeway in bringing the activities of these nonresident corporations within the scope of their respective jurisdictions.
> This is neither a unique nor a novel idea. As the Court first noted in 1957:
>
>> "[M]any commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail

No. 36298-1-III
*Downing. v. Losvar*

> across state lines.  At the same time modern transportation
> and communication have made it much less burdensome for a
> party sued to defend himself in a State where he engages in
> economic activity."
>
> . . . "[T]he historical developments noted in *McGee* . . . have only
> accelerated in the generation since that case was decided."
> Moreover, this "trend . . . toward expanding the permissible scope of
> state jurisdiction over foreign corporations and other nonresidents," is
> entirely consistent with the "traditional notions of fair play and substantial
> justice," that control our inquiry under the Due Process Clause.  As active
> participants in interstate and foreign commerce take advantage of the
> economic benefits and opportunities offered by the various States, it is only
> fair and reasonable to subject them to the obligations that may be imposed
> by those jurisdictions.  And chief among the obligations that a nonresident
> corporation should expect to fulfill is amenability to suit in any forum that
> is significantly affected by the corporation's commercial activities.

*Helicopteros Nacionales de Colombia, SA v. Hall*, 466 U.S. 408, 422-23 (1984)

(Brennan, J., dissenting) (most alterations in original) (citations omitted) (quoting *McGee*

*v. International Life Insurance Co.*, 355 U.S. 220, 222-23 (1957); *International Shoe Co.*

*v. Washington*, 326 U.S. 310, 316 (1945)).

As active participants in interstate and foreign commerce take advantage of the

economic benefits and opportunities offered by the various states, those states may fairly

and reasonably subject the participants to jurisdiction.  A nonresident corporation should

expect amenability to suit in any forum that is significantly affected by the corporation's

commercial activities.  *Helicopteros Nacionales de Colombia, SA v. Hall*, 466 U.S. 408,

423 (1984) (Brennan, J., dissenting).

32

No. 36298-1-III
*Downing. v. Losvar*


The United States Supreme Court recently revisited the concept of purposeful

availment, in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017

(2021), and determined that the Ford Motor Company had purposefully availed itself of

the markets of Montana and Minnesota. The Court wrote:

> By every means imaginable—among them, billboards, TV and radio
> spots, print ads, and direct mail—Ford urges Montanans and Minnesotans
> to buy its vehicles, including (at all relevant times) Explorers and Crown
> Victorias. Ford cars—again including those two models—are available for
> sale, whether new or used, throughout the States, at 36 dealerships in
> Montana and 84 in Minnesota. And apart from sales, Ford works hard to
> foster ongoing connections to its cars' owners. The company's dealers in
> Montana and Minnesota (as elsewhere) regularly maintain and repair Ford
> cars, including those whose warranties have long since expired. And the
> company distributes replacement parts both to its own dealers and to
> independent auto shops in the two States. Those activities, too, make Ford
> money. And by making it easier to own a Ford, they encourage Montanans
> and Minnesotans to become lifelong Ford drivers.

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. at 1028.

In contrast to *Ford Motor Co.* is *World-Wide Volkswagen Corp. v. Woodson*, 444

U.S. 286 (1980), relied on by Textron Aviation. The United States Supreme Court

examined whether World-Wide Volkswagen had deliberately availed itself of the

Oklahoma market. World-Wide Volkswagen was incorporated and headquartered in

New York. It distributed vehicles, parts, and accessories to retail dealers in New York,

New Jersey, and Connecticut. One of the retail dealers sold an automobile in New York.

The vehicle purchaser drove the car through the State of Oklahoma when another vehicle

struck it, causing a fire that severely burned the purchaser and her two children. The

33

No. 36298-1-III
*Downing. v. Losvar*

injured family brought a products-liability action against World-Wide Volkswagen in

Oklahoma and alleged that their burn injuries resulted from defective design and

placement of the vehicle's gas tank and fuel system. The Court found no circumstances

demonstrating that World-Wide Volkswagen had purposefully availed itself of the

Oklahoma market:

> [World-Wide Volkswagen] carr[ies] on no activity whatsoever in
> Oklahoma. They close no sales and perform no services there. They avail
> themselves of none of the privileges and benefits of Oklahoma law. They
> solicit no business there either through salespersons or through advertising
> reasonably calculated to reach the State. Nor does the record show that
> they regularly sell cars at wholesale or retail to Oklahoma customers or
> residents or that they indirectly, through others, serve or seek to serve the
> Oklahoma market. In short, respondents seek to base jurisdiction on one,
> isolated occurrence and whatever inferences can be drawn therefrom: the
> fortuitous circumstance that a single Audi automobile, sold in New York to
> New York residents, happened to suffer an accident while passing through
> Oklahoma.

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 295. Thus, the Court found a

purchaser's transfer of a vehicle from one state to another, without more, too random,

isolated, or fortuitous to establish jurisdiction over a foreign seller. Notably, the

Volkswagen manufacturer did not challenge jurisdiction.

Textron Aviation and Cessna Aircraft Company probably lack the extensive

contacts in Washington State that Ford Motor Company maintains with Minnesota and

Montana. But the plane manufacturer's contacts exceed the contacts that World-Wide

Volkswagen maintained in Oklahoma. A defendant need not have Ford's staggering

34

No. 36298-1-III
*Downing. v. Losvar*

number of contacts with the forum state to sustain the requirement of purposeful availment. *LNS Enterprises LLC v. Continental Motors, Inc.*, 22 F.4th 852, 861 (9th Cir. 2022). More importantly, the quality of Textron Aviation's contacts with Washington echoes the quality of contacts that Ford maintains with all states.

Textron Aviation, and its predecessor Cessna, actively and purposefully pursued and continue to pursue the Washington State aircraft market. Washington houses 3,040 Cessna aircraft. Cessna communicates with these customers and boasts that it will quickly and competently service the planes in the Evergreen State. Textron Aviation's Washington activities encourage pilots to fly, land, maintain, and resell their Cessna planes within the forum.

Textron Aviation maintains a Washington mobile response team that travels throughout the state to perform maintenance and repairs. Textron Aviation's website lists six authorized service centers in Washington that perform maintenance on planes.

At some varying date in the last decade, Textron Aviation switched from a dealership model to a direct sales model for Cessna aircraft. As a result, Textron Aviation contends that, assuming Cessna once had minimum contacts, those contacts no longer exist. It contends that a direct sales model limits its contacts with Washington State. We disagree. Under Textron Aviation's current model of marketing, Washington residents deal directly with Textron Aviation in order to purchase new and used planes. Although Textron Aviation implies that buyers of their aircraft travel to Kansas to accept

35

No. 36298-1-III
*Downing. v. Losvar*

delivery, Textron Aviation does not deny it knowingly sells planes to Washington State residents. Textron Aviation does not deny knowledge that scores of its new planes go to Washington State each year in addition to the thousands of planes already present. Anyway, at the time of the sale of the relevant Cessna T182T to its first buyer, Cessna marketed the plane through an authorized Washington dealer.

The parties did not engage in any jurisdictional discovery. Thus, the record does not indicate the extent of Textron Aviation sales and advertising in Washington or the past sales of Cessna craft in the state. A Textron Aviation corporate officer avers that, as of 2015, Washington represented less than one percent of the company's total revenue and that advertising does not specifically target Washington residents. Still, with fifty states and on the assumption of no world-wide sales, the average state would only provide Textron Aviation with two percent of its sales. Textron Aviation has not disclosed the amount of income it gains each year from Washington residents or the annual sales to Washington residents.

Like Ford being a quintessential American auto manufacturer, Cessna is a classic small plane producer. Textron Aviation markets its Cessna planes and other aircraft with the boast of being a worldwide leader in general aviation. Clyde Cessna would be proud of Cessna's presence throughout Washington State.

An illustrative decision involving a plane is *Cirrus Design Corporation v. Berra*, 633 S.W.3d 640 (Tex. App. 2021). Cirrus manufactured aircraft in Minnesota. The

36

No. 36298-1-III
*Downing. v. Losvar*

corporation was incorporated in Wisconsin.  Lee Berra died in a Texas crash of an

airplane manufactured by Cirrus.  Berra owned the plane, but did not purchase it from

Cirrus.  He purchased the plane from third parties.  Two weeks before the crash, he took

the plane to a Cirrus-authorized service center in San Antonio for maintenance and repair.

The center replaced the aircraft's flap system with parts sent by Cirrus from Minnesota.

An expert concluded that the flap system contributed to the crash.  The trial court denied

Cirrus' motion to dismiss for lack of personal jurisdiction.

On appeal, Cirrus Design Corporation contended that the Texas courts lacked both

general personal jurisdiction and specific personal jurisdiction over it.  The Texas Court

of Appeals avoided addressing general jurisdiction because it agreed the state courts

possessed specific jurisdiction.  Cirrus marketed its products in Texas.  Cirrus maintained

thirty facilities and affiliates in the forum state.  Cirrus channeled advice to customers in

Texas.  The existence of sales directors and service providers in Texas and the sending of

advice to customers in the forum state sufficed to create the contacts needed for specific

personal jurisdiction.  The contacts were purposeful and not random or fortuitous.  The

crash occurred in and may have resulted from parts shipped to the Lone Star State such

that the claims arose from or were related to activity conducted in Texas.

We recognize that the parts that allegedly caused the crash of Lee Berra's plane

had been shipped to Texas, but we do not deem this fact necessary to the ruling in *Cirrus*

37

No. 36298-1-III
*Downing. v. Losvar*

*Design Corporation*.  The Texas court emphasized that Cirrus had allegedly manufactured a defective plane that crashed in its jurisdiction.

In *Cohen v. Continental Motors, Inc.*, 2021-NCCOA-449, 864 S.E.2d 816 (N.C. 2021), the appellate court ruled that North Carolina courts possessed jurisdiction over the manufacturer of a plane's engine when the plane crashed in the Tar Heel State. Continental Motors was a Delaware corporation with a principal place of business in Alabama.  The particular engine at issue had been manufactured in Alabama and installed by the airplane manufacturer in Bend, Oregon.  Continental Motors sold airplane parts in all fifty states and internationally.  The company maintained no sales force in North Carolina, but sold its parts to distributors within the state.  Service centers in North Carolina could access the company's service links.  Based on *Ford Motor Co. v. Montana Eighth Judicial District Court*, the North Carolina court ruled that Continental Motors maintained sufficient contacts with the forum state to gain jurisdiction.  The court ruled that the plaintiff need not show proof that the claim arose because of the defendant's in-state conduct, as long as the product malfunctioned in the forum state.

Textron Aviation relies heavily on *LNS Enterprises LLC v. Continental Motors, Inc.*, 22 F.4th 852 (9th Cir. 2022), in which the federal appellate court ruled that Arizona courts lacked personal jurisdiction over both Textron Aviation and Continental Motors because of a lack of sufficient minimum contacts.  The plaintiff purchased a used Cessna aircraft, equipped with a Continental engine.  The plane was damaged in a crash

38

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

occurring in Arizona.  Continental shipped the engine to Oregon, where Columbia

Aircraft Manufacturing installed it into the plane.  Shortly thereafter, Cessna acquired the

assets of Columbia.  As we know, Cessna later became a subsidiary of Textron, and, in

2017, Cessna and Textron Aviation merged.  In response to Textron's motion to dismiss,

the plaintiff filed no countering affidavits.  Textron Aviation did not manufacture, design,

or service the plaintiff's aircraft, let alone do any of these acts in Arizona.  Textron

Aviation acknowledged one service center in Arizona, but the court deemed this limited

presence unimportant because of a lack of relationship with the lawsuit to this contact.

According to the Ninth Circuit, the United States Supreme Court in *Ford Motor Co.*

cabined its analysis of personal jurisdiction to the same model of the product at issue,

which was advertised, sold, and serviced in the forum states.  The Ninth Circuit also

emphasized that Cessna acquired the assets of the manufacturer, Columbia Aircraft.  The

two companies did not merge.

*LNS Enterprises* lacks persuasiveness for at least three reasons.  First, the plaintiff

failed to present any facts countering Textron Aviation's motion to dismiss.  Second, the

manufacturer did not merge with Cessna or Textron Aviation.  Third, as we next analyze,

we adjudge the Ninth Circuit view of a relationship between the lawsuit and the forum

state as too narrow and contrary to *Ford Motor Co.*

39

No. 36298-1-III
*Downing. v. Losvar*

Arises From or Relates To

We move to the second element of the tripartite test.  In order for a court to exercise specific jurisdiction over a claim, an affiliation must exist between the forum and the underlying controversy, principally an activity or an occurrence that takes place in the forum state.  *Goodyear Dunlop Tire Operations, SA v. Brown*, 564 U.S. 915, 919 (2011).  Without this affiliation, the forum state lacks specific personal jurisdiction regardless of the extent of a defendant's unconnected activities in the state.  *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1781 (2017).  Even regularly occurring sales of a product in a state do not justify the exercise of jurisdiction over a claim unrelated to those sales.  *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. at 1781.

The United States Supreme Court clarified the "arising out of or relating to" requirement in its most recent personal jurisdiction decision, *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021).  The case combined two suits in which Minnesota and Montana state courts asserted personal jurisdiction over the Ford Motor Company in products-liability claims stemming from car accidents.  In both cases, Ford had sold the crashed vehicles outside the forum states, and the initial purchasers then resold the vehicles to forum residents, where collisions occurred.

Despite this complication, the Court wrote:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

> [T]he owners of these cars might never have bought them, and so these suits might never have arisen, except for Ford's contacts with their home States. Those contacts might turn any resident of Montana or Minnesota into a Ford owner—even when he buys his car from out of state. He may make that purchase because he saw ads for the car in local media. And he may take into account a raft of Ford's in-state activities designed to make driving a Ford convenient there: that Ford dealers stand ready to service the car; that other auto shops have ample supplies of Ford parts; and that Ford fosters an active resale market for its old models.

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. at 1029. Similarly, Textron Aviation serves a market of Cessna plane owners in Washington, offering mobile maintenance and repair services designed to make flying a plane convenient here. Washington residents purchase Cessna planes knowing that service is readily available anywhere within the Evergreen State.

Textron Aviation argues that this court should apply a causation-only analysis in deciding whether this case arises out of or relates to its contacts with Washington. According to Textron Aviation, its maintenance services, replacement parts, or flight training support did not cause the accident.

Ford Motor Company also argued that its activities did not connect it to Montana and Minnesota because it did not manufacture the vehicles in the respective states. Nor did it deliver to or sell the subject cars in the forum states. Ford argued in support of a strict causal relationship and a "but for" test of specific personal jurisdiction. Ford contended that the plaintiffs could not show that, "but for" Ford's in-state activities, the

41

No. 36298-1-III
*Downing. v. Losvar*

plaintiffs would have suffered injury. The United States Supreme Court rejected this approach:

> [O]ur most common formulation of the rule demands that the suit "arise out of *or relate to* the defendant's contacts with the forum." The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing. That does not mean anything goes. In the sphere of specific jurisdiction, the phrase "relate to" incorporates real limits, as it must to adequately protect defendants foreign to a forum. But again, we have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct.

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. at 1026 (quoting *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017)). Thus, while a direct causal relationship will satisfy the "arising under" prong of the inquiry, such a causal relationship is not needed under the "relating to" prong.

In *Ford Motor Co.*, the United States Supreme Court also clarified its prior decision on personal jurisdiction in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), which Textron Aviation repeatedly cites. In the latter case, over 600 plaintiffs, most of whom were not California residents, filed a civil action in a California State court against Bristol-Myers Squibb Company, alleging various state law claims based on injuries arising from the drug, Plavix. Bristol-Myers Squibb sold and marketed Plavix in California, but did not develop the drug in California, create a marketing strategy for the drug in California, manufacture, label, or package the drug in California,

42

No. 36298-1-III
*Downing. v. Losvar*

or work on the regulatory approval of the product in California. The nonresident

plaintiffs did not allege they obtained Plavix through California sources nor claim that

their injuries or treatment occurred in California. The California Supreme Court found

specific jurisdiction as to the nonresident plaintiffs' claims based on Bristol-Myers

Squibb's extensive contacts with California, which that court held required "'a less direct

connection between [Bristol-Myers Squibb's] forum activities and plaintiff's claims than

might otherwise be required.'" *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. at

1779 (quoting *Bristol-Myers Squibb Co. v. Superior Court*, 1 Cal. 5th 783, 377 P.3d 874,

889, 206 Cal. Rptr. 3d 636 (2016)). The United States Supreme Court reversed. The

Court noted that a corporation's continuous activity within a state does not suffice to

support the demand that the corporation be amenable to suits unrelated to that activity.

The Court declared:

> The [California] Supreme Court found that specific jurisdiction was
> present without identifying any adequate link between the State and the
> nonresidents' claims. As noted, the nonresidents were not prescribed
> Plavix in California, did not purchase Plavix in California, did not ingest
> Plavix in California, and were not injured by Plavix in California. The
> mere fact that *other* plaintiffs were prescribed, obtained, and ingested
> Plavix in California—and allegedly sustained the same injuries as did the
> nonresidents—does not allow the State to assert specific jurisdiction over
> the nonresidents' claims.

*Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. at 1781.

In *Ford Motor Co.*, Ford argued to the United States Supreme Court that *Bristol-*

*Myers* foreclosed jurisdiction because the particular vehicles at issue had been initially

43

No. 36298-1-III
*Downing. v. Losvar*

sold outside of the relevant forum states. The Court rejected Ford's reading of *Bristol-Myers*:

> We found jurisdiction improper in *Bristol-Myers* because the forum State, and the defendant's activities there, lacked any connection to the plaintiffs' claims. The plaintiffs, the Court explained, were not residents of California. They had not been prescribed Plavix in California. They had not ingested Plavix in California. And they had not sustained their injuries in California. In short, the plaintiffs were engaged in forum-shopping— suing in California because it was thought plaintiff-friendly, even though their cases had no tie to the State. That is not true of the cases before us. Yes, Ford sold the specific products in other States, as Bristol-Myers Squibb had. But here, the plaintiffs are residents of the forum States. They used the allegedly defective products in the forum States. And they suffered injuries when those products malfunctioned in the forum States. In sum, each of the plaintiffs brought suit in the most natural State—based on an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place" there.

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. at 1031 (alterations in original) (citations omitted) (quoting *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780-81 (2017)).

The United States Supreme Court, in *Ford Motor Co. v. Montana Eighth Judicial District Court*, explicitly rejected a "but for" causation test as the sole means of satisfying the "arising out of or relating to" requirement for personal jurisdiction. The Court found that personal jurisdiction arose under the "relating to" prong even when plaintiffs "did not in fact establish, or even allege . . . causal links." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1029 (2021). The Court reasoned that jurisdiction should not "ride on the exact reasons for an individual plaintiff's purchase, or

44

No. 36298-1-III
*Downing. v. Losvar*

on his ability to present persuasive evidence about them." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. at 1029. In a footnote, the Court further expounded:

> It should, for example, make no difference if a plaintiff had recently moved to the forum State with his car, and had not made his purchasing decision with that move in mind—so had not considered any of Ford's activities in his new home State.

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. at 1029 n.5.

Prior to the United States Supreme Court's recent holding in *Ford Motor Co.*, the Washington Supreme Court adopted a "but for" test for the second prong of specific personal jurisdiction analysis in *Shute v. Carnival Cruise Lines*, 113 Wn.2d 763, 772 (1989). Division One of this court has twice applied the "but for" test in denying personal jurisdiction in cases involving international contracts claims. *SeaHAVN, Ltd. v. Glitner Bank*, 154 Wn. App. 550, 570-71, 226 P.3d 141 (2010); *CTVC of Hawaii, Co. v. Shinawatra*, 82 Wn. App. 699, 719-20 (1996).

Since deciding *Shute v. Carnival Cruise Lines*, the Washington Supreme Court has eschewed "but for" analysis. Although the state Supreme Court relies on the "*Shute* factors" to guide personal jurisdiction analysis, "but for" causation has played no role in the high court's subsequent decisions. *Noll v. American Biltrite Inc.*, 188 Wn.2d 402, 411-16 (2017); *FutureSelect Portfolio Management, Inc. v. Tremont Group Holdings,*

45

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

*Inc.*, 180 Wn.2d 954, 963-66, 331 P.3d 29 (2014); *Failla v. FixtureOne Corp.*, 181 Wn.2d 642, 649-55, 336 P.3d 1112 (2014).

In many decisions, the Washington Supreme Court has folded the state long-arm statute analysis with the requirements of the U.S. Constitution, while emphasizing that the statute is coextensive with the federal due process clause. *State v. LG Electronics, Inc.*, 186 Wn.2d 169, 176 (2016); *Pruczinski v. Ashby*, 185 Wn.2d 492, 500 (2016). The state high court reconsiders its precedent when the legal underpinnings of the precedent have changed or disappeared. *W.G. Clark Construction Co. v. Pacific Northwest Regional Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014); *accord Chong Yim v. City of Seattle*, 194 Wn.2d 682, 692, 451 P.3d 694 (2019); *Deggs v. Asbestos Corp. Ltd.*, 186 Wn.2d 716, 729-30, 381 P.3d 32 (2016). Thus, we conclude that the state Supreme Court will follow the *Ford Motor Co.* causation analysis and abandon the "but for" causation test.

The instant case involves substantial similarities to *Ford Motor Co.* The Cessna plane was originally sold out-of-state and then resold to Albert Losvar, who brought the plane into Washington. The plane crashed in the State of Washington, killing the pilot and his passenger. The present suit alleges a theory of products liability against the plane manufacturer.

No. 36298-1-III
*Downing. v. Losvar*

Fairness

The last part of the due process test centers around the fairness and reasonableness of the assertion of jurisdiction by the forum state. *Doe v. Unocal Corp.*, 248 F.3d 915, 925 (9th Cir. 2001). Once the plaintiff meets the burden of proving minimum contacts, a presumption of reasonableness of jurisdiction arises and the burden shifts to the defendant to prove the assertion of jurisdiction would be so unreasonable in light of traditional notions of fair play and substantial justice as to overcome the presumption of reasonableness. *Bridges v. Mosaic Global Holdings, Inc.*, 2008-0113 (La. App. 1 Cir. 10/24/08), 23 So.3d 305, 315. The defendant must present a compelling case that other considerations render jurisdiction unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

Once the plaintiff establishes minimum contacts, the court may consider these contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985); *International Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). In determining fundamental fairness, the relevant considerations are: (1) the defendant's burden in responding to the lawsuit in the forum state, (2) the forum state's interest in applying its law and providing a forum, (3) the plaintiff's interest in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the state's interest in furthering fundamental social policies.

47

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 36298-1-III
*Downing. v. Losvar*

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985). A state possesses a

"manifest interest" in providing its residents with a convenient forum for redressing

injuries inflicted by out-of-state actors. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,

473 (1985).

The due process clause may not be wielded as a territorial shield to avoid interstate

obligations voluntarily assumed. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474

(1985). Because modern transportation and communications render defending oneself in

another state less burdensome, a party will generally not suffer unfairness by litigating in

another forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. at 474. Only in rare cases will

the exercise of jurisdiction not comport with fair play and substantial justice when the

nonresident defendant has purposefully established minimum contacts with the forum

state. *Asshauer v. Farallon Capital Partners, LP*, 319 S.W.3d 1, 8 n.7 (Tex. App. 2008).

Textron Aviation argues that, because Downing and Losvar are also pursuing their

claims in Kansas, whose courts have uncontested general jurisdiction over the company,

Washington should not exercise jurisdiction. Textron Aviation identifies no case in

which personal jurisdiction has been denied on this basis. Washington holds a significant

legitimate interest in providing a forum for suit involving a plane crash within the state.

Washington State should be free to regulate planes that crash in Washington State and

kill Washington residents.

No. 36298-1-III
*Downing. v. Losvar*

Fairness works in favor of Washington State gaining personal jurisdiction, not in Textron Aviation avoiding jurisdiction. Textron Aviation enjoys the benefit of Washington's laws in enforcing contracts, defending property, and selling its goods to Washington State consumers. Textron Aviation's finance arm has brought suits in Washington State courts. To Textron Aviation's benefit, Washington State does not afford punitive damages. *Barr v. Interbay Citizens Bank of Tampa, Fla.*, 96 Wn.2d 692, 697, 635 P.2d 441, 649 P.2d 827 (1981).

Washington possesses an interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. The survivors of Downing and Losvar would suffer inconvenience in litigating halfway across the country in Kansas, when compared to a worldwide leader in aviation defending a lawsuit in Washington. Textron Aviation representatives can even fly in one of the company's Cessna planes or posh business jets to Okanogan County.

Textron Aviation also argues that exercise of jurisdiction would be unfair because respondents advance a "failure to warn" theory, basing jurisdiction on an omission rather than affirmative action by company. According to Textron Aviation, any failure to warn would relate only to Textron Aviation's headquarters. Textron Aviation cites to several nonbinding cases in support of this argument. We reject this argument. While Downing and Losvar allege a lack of warning as a cause of action against Textron Aviation, they also allege defective design and breach of warranty. The United States Supreme Court

49

No. 36298-1-III
*Downing. v. Losvar*

approved jurisdiction over foreign defendants in suits alleging design defect, failure to

warn, negligence, products-liability, and breach of warranty. *Ford Motor Co. v. Montana*

*Eighth Judicial District Court*, 141 S. Ct. 1017, 1023 (2021).

CONCLUSION

We affirm the superior court's ruling that it possesses personal jurisdiction over

Textron Aviation for purposes of the claims asserted by Downing and Losvar.  We

remand for further proceedings.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Pennell, J.